DAVID L. NEALE (SBN 141225)
JULIET Y. OH (SBN 211414)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: dln@lnbyb.com, jyo@lnbyb.com, lls@lnbyb.com

Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:13-bk-13163-SC |
| EVERGREEN OIL, INC., | Jointly Administered With:<br>Case No. 8:13-bk-13168 |
| Debtor. | Chapter 11 |
| Jointly Administered Debtors<br>And Debtors-in-Possession | |
| Affects:<br>☐ Evergreen Oil, Inc., Only<br>☐ Evergreen Environmental Holdings,<br>    Inc., Only<br>☒ All Debtors | **DECLARATION OF WILLIAM<br>SCOTTINI IN SUPPORT OF DEBTOR'S<br>EMERGENCY "FIRST DAY" MOTIONS**<br><br>DATE:        April 10, 2013<br>TIME:        3:30 p.m.<br>PLACE:    Courtroom "5C"<br>                411 West Fourth Street<br>                Santa Ana, California |

1

1     I, William Scottini, hereby declare as follows:

2       1.    I am over 18 years of age.  I have personal knowledge of the facts set forth herein,

3  and, if called as a witness, could and would testify competently with respect thereto.

4       2.    I am the Chief Financial Officer of Evergreen Oil, Inc. ("EOI") and Evergreen

5  Environmental Holdings, Inc. ("EEHI," and together with EOI, the "Debtors"), the debtors and

6  debtors in possession in the above-captioned bankruptcy cases, and am therefore familiar with the

7  business operations and financial books and records of the Debtors.  I have personal knowledge of

8  the facts set forth below and, if called to testify, I would and could competently testify thereto.

9       3.    I have access to the Debtors' books and records.  I am familiar with the history,

10  organization, operations and financial condition of the Debtors.   The records and documents

11  referred to in this Declaration constitute writings taken, made, or maintained in the regular or

12  ordinary course of the Debtors' business at or near the time of act, condition or event to which they

13  relate by persons employed by the Debtors who had a business duty to the Debtors to accurately and

14  completely take, make, and maintain such records and documents.  The statements set forth in this

15  declaration are based upon my own personal knowledge and my knowledge of the Debtors' books

16  and records.

17       4.    I make this declaration in support of the following emergency "first day" motions

18  filed concurrently herewith by one or both of the Debtors:

19         a.   "Debtors' Emergency Motion For Entry Of An Interim Order: (I) Authorizing
              The Debtors To (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§
20            105, 361, 362, 364(c), 364(d)(1) And 364(e), And (B) Utilize Cash Collateral Of
              Prepetition Secured Entities Pursuant To 11 U.S.C. § 363; (II) Granting
21            Adequate Protection To Prepetition Secured Lenders Pursuant To 11 U.S.C. §§
              361, 362, 363 And 364; (III) Scheduling A Final Hearing Pursuant To
22            Bankruptcy Rules 4001(b) and 4001(c); And (IV) Granting Related Relief" (the
              "DIP Motion") [Filed by both EOI and EEHI].
23

24         b.   "Debtor's Emergency Motion For Entry Of An Order For Joint Administration
              Of Cases" (the "Joint Administration Motion") [Filed by both EOI and EEHI].
25

26         c.   "Debtor's Emergency Motion For Authority To (1) Pay Pre-Petition Priority
              Wages; And (2) Honor Employment And Benefit Policies" (the "Wage Motion")
27            [Filed by EOI only].

28

d.  "Debtor's Emergency Motion For Entry Of An Order Authorizing Debtor To Provide Adequate Assurance Of Future Payment To Utility Companies Pursuant to 11 U.S.C. § 366" (the "Utility Motion") [Filed by EOI only].

e.  "Debtor's Emergency Motion For Entry Of An Order Authorizing Debtor To Honor Pre-Petition Obligations To Vendors And To Continue Vendor Programs" (the "Vendor Programs Motion") [Filed by EOI only].

f.  "Debtor's Emergency Motion For Entry Of An Order Authorizing The Debtor To Implement And Maintain Cash Management System" (the "Cash Management Motion") [Filed by EOI only].

## A.   Background Information and Events Leading to Bankruptcy.

5.  Each of the Debtors filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on April 9, 2013 (the "Petition Date"). The Debtors continue to operate their businesses, manage their financial affairs and operate their bankruptcy estates as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.  EOI was founded in 1984 to provide clean and responsible used oil collection for service stations. The company has grown to lead the industry in developing safe and efficient used oil recovery operations while providing other environmental services as a one-stop shop for hazardous waste management and disposal in the State of California.

7.  Headquartered in Irvine, California, with facilities located in Newark and Carson, California, EOI is one of the largest waste oil collectors in California, and the only oil re-refining operation in California. EOI is also a major provider of hazardous waste services, offering customers across California a full range of environmental services to handle all of their waste management needs. All of EOI's hazardous waste environmental services are geared towards recycling and reuse of materials collected. EOI purchases and recycles oil by using a re-refining process developed by EOI which allows EOI to reclaim three quarts of every gallon that EOI treats. Specifically, EOI collects, transports and recycles the following: (1) used motor oil, for re-refining into lube oil; (2) used oil filters, for recycling; (3) oily water, for treatment and safe

disposal; (4) used antifreeze, sent to offsite recyclers for re-use; and (5) other hazardous and non-hazardous waste, sent to offsite authorized disposal sites.

8.      EEHI owns 100% of the stock in EOI. EEHI is not an operating company and solely exists for the purpose of owning 100% of the stock in EOI. EEHI has no creditors or other assets apart from its stock in EOI.

9.      Prior to the bankruptcy filing, EOI experienced a fire which severely damaged some of EOI's operating equipment.  Due to the fire and for other reasons, EOI's cash flow was hampered making it difficult for EOI to operate.  In order to resolve EOI's cash flow predicament, and to maximize the value of its business during the year prior to the bankruptcy filing, EOI determined to market itself for sale to various interested parties.  As of September 29, 2012, EOI had repaired the damage to its operating equipment, and EOI has continued operating in the ordinary course since such date.  Moreover, EOI's marketing efforts resulted in expressions of interest by several parties regarding a potential transaction that would result in the sale of EOI's business as a going concern.  However, EOI and its parent company, EEHI, were forced to file for bankruptcy before a suitable purchase and sale transaction could be finalized.

10.      Through their bankruptcy cases, the Debtors intend to market and sell EEHI's stock in EOI, which is owned by EEHI, or under certain circumstances, all or substantially all the assets of EOI (collectively, the "Assets"), free and clear of all liens, to effectuate a sale of EOI's business as a going concern.  The proceeds of the sale will be used to repay EOI's creditors.  Given all of the pre-petition efforts and discussions with potential purchasers which took place, the Debtors anticipate an expeditious marketing and sale process that will allow the Debtors to execute a transaction that both ensures the ongoing viability of EOI's business and maximizes the value available to all creditors.  Concurrently herewith, the Debtors have filed an application seeking to employ Cappello Capital Corp. as the Debtors' exclusive investment banker to, among other things, identify buyers for EOI's stock and facilitate the consummation of a sale of EOI's stock.

**B.**    **The DIP Financing and Cash Collateral Motion (the "DIP Motion")**[1]**.**

12.    As noted above, EEHI owns 100% of the stock in EOI.  EEHI is not an operating company and has no assets other than the stock in EOI.

13.    The primary assets of EOI are the two main facilities from which EOI operates its business.  These two facilities, which are owned and operated by EOI, consist of the re-refinery facility located at 6880 Smith Avenue, Newark, California 94560 (the "Newark Facility") and the transfer and storage facility located at 16540 South San Pedro, Carson, California 90746 (the "Carson Facility," and together with the Newark Facility, the "Facilities").  EOI owns the real property and improvements located at both of the Facilities, as well as the equipment and inventory maintained at the Facilities.

14.    The Debtors' primary creditor is Guggenheim Corporate Funding, LLC ("Guggenheim"), as administrative agent (in such capacity, the "Prepetition Agent") for a group of lenders (the "Prepetition Lenders," and together with the Prepetition Agent, the "Prepetition Secured Parties").  EOI is the borrower under that certain Amended and Restated Credit Agreement, dated as of August 3, 2011 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "Prepetition Credit Agreement") with the Prepetition Secured Parties, and all security agreements, pledge agreements, mortgages, deeds of trust and other security and ancillary documents executed by EOI or any guarantor in favor of the Prepetition Agent (on behalf of itself and the other Prepetition Secured Parties) in connection therewith (collectively, the "Prepetition Collateral Documents" and, together with the Prepetition Credit Agreement, the "Prepetition Loan Documents").  EOI is currently indebted to the Prepetition Secured Parties in an amount of no less than $66,242,734.27.

15.    Both EEHI and Evergreen Holdings, Inc., the sole shareholder of EEHI, guaranteed the Obligations of EOI under the Prepetition Loan Documents.

16.    I believe that the Prepetition Secured Parties are the only parties with a security

---

[1] All terms not specifically defined herein shall have the meanings ascribed to them in the DIP Motion.

1  interest in the Debtors' cash.

2       17.    Although EOI was able to recover from the fire and repair the resulting damage to

3  its operating equipment, and is fully operational at this time, EOI continues to suffer financially

4  from the negative impact that the fire had on EOI's cash flow.  As a result of the Debtors'

5  financial condition, the use of the Debtors' cash collateral alone will be insufficient to meet the

6  Debtors' immediate postpetition liquidity needs.  EOI requires new funding to maintain its

7  business operations and preserve the value of its assets while the Debtors pursue a marketing and

8  sale process which will allow the Debtors to sell EOI's business as a going concern, for the

9  benefit of all creditors.

10       18.    Fortunately, Guggenheim Private Debt Fund Note Issuer, LLC (the "DIP Lender")

11  has agreed to provide EOI with delayed draw term loans in the aggregate principal amount not to

12  exceed $6,000,000 million (the "DIP Loans"), drawn under a debtor-in-possession credit facility

13  (the "DIP Facility"), pursuant to the terms and conditions set forth in that certain DIP Credit

14  Agreement, by and among EOI, EEHI as a guarantor[2], and the DIP Lender (as the same may be

15  amended, restated, supplemented or otherwise modified from time to time pursuant to the terms

16  thereof, the "DIP Credit Agreement", and together with any related documents and instruments

17  delivered pursuant to or in connection therewith, collectively, the "DIP Loan Documents"), which

18  shall be substantially similar to the form attached as Exhibit "A" to the Interim Order which is

19  attached hereto as **Exhibit "1"**.

20       19.    Based on the Debtors' cash flow forecast setting forth all projected cash receipts

21  and cash disbursements following the Petition Date through and including the Scheduled Maturity

22  Date (the "Initial Approved Budget"), the Debtors believe that the proposed financing under the

23  DIP Facility will provide the Debtors with sufficient funds to carry on the operation of EOI's

24  business and successfully consummate a going-concern sale of EOI's business.  A true and

25  correct copy of the Initial Approved Budget is attached as Exhibit "B" to the Interim Order.

26
27  [2] EEHI's parent company, Evergreen Holdings, Inc., a non-debtor entity, is also a guarantor of EOI's obligations, and shall remain a guarantor of the DIP Facility.  EEHI and Evergreen Holdings, Inc. are each referred to as a "Guarantor" and collectively, as the "Guarantors."

28

20.    The Debtors have not been able to obtain sufficient interim and long-term financing from sources other than the DIP Lender on terms and subject to conditions more favorable than under the DIP Facility and the DIP Loan Documents, and have not been able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors have also not been able to obtain secured credit allowable for the purposes set forth in the DIP Credit Agreement without the Debtors' (i) granting to the DIP Lender, subject to the Carve-Out, (x) the DIP Superpriority Claims and (y) the DIP Liens in the DIP Collateral, as provided in the Interim Order and in the DIP Loan Documents; and (ii) providing the Prepetition Secured Parties the adequate protection as provided in the Interim Order.

21.    The DIP Lender has indicated that it is willing to provide the Debtors with the proposed secured financing solely on the terms and conditions set forth in the Interim Order and the DIP Loan Documents.  After considering all of their alternatives, I believe that the DIP Facility to be provided by the DIP Lender and the authorization to use the Cash Collateral to be provided by the Prepetition Secured Parties represents the best financing presently available to the Debtors.

22.    I do not believe that the Debtors have the ability to continue to operate their business or to maintain the going concern value of their assets and their estates unless the Debtors have the ability to use their cash collateral to pay their projected expenses in accordance with the Initial Approved Budget.  I believe that the Debtors' inability to pay those expenses would cause immediate and irreparable harm to the Debtors' bankruptcy estates.  I believe that the Debtors' inability to pay their expenses, including payroll, utilities, and other operating expenses would result in the immediate shutdown of EOI's business and the decimation of the going concern value of EOI's business and assets. I believe that the preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful restructuring of the Debtors through these Chapter 11 cases.

23.    I believe that (i) the terms and conditions of the DIP Facility are fair and

reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Lender and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lender have been extended, issued or made, as the case may be, in good faith.

**C.**    **The Joint Administration Motion.**

25.    Through the Joint Administration Motion, the Debtors are seeking to have their bankruptcy cases jointly administered.

26.    I believe that the Debtors' cases are inextricability intertwined and that the vast majority of the issues and matters that arise in the Debtors' cases will be interrelated, and that any transaction or exit strategy pursued in connection with such bankruptcy cases will necessarily involve both of the Debtors. Accordingly, I believe that joint administration of EOI's bankruptcy case with the bankruptcy case of EEHI is appropriate.

27.    I believe that joint administration will avoid duplicative expenses and will ensure that creditors in each of the cases will receive appropriate notice of pertinent matters. In addition, I believe that joint administration of the two cases, including the use of a single pleadings docket, the combining of notices to creditors of the different estates, and the joint handling of purely administrative matters will aid in expediting the cases and rendering the process less costly, without prejudicing the substantive rights of any creditor.

**D.**    **The Wage Motion.**

28.    EOI currently has approximately 186 permanent non-insider employees (collectively, the "Employees," and each, an "Employee"). The vast majority of the Employees are paid on an hourly basis. All of the Employees are paid bi-weekly, on every other Friday, approximately one week in arrears. So, for example, payroll paid on Friday, March 29, 2013 covered the period from March 11, 2013 through and including March 24, 2013. A list of EOI's Employees, which reflects the amount of wages paid to the Employees on March 29, 2013, is

attached as **Exhibit "2"** hereto. The Employees' 401K contributions (the "Employee Contributions") and EOI's matching contributions (the "Debtor's Contributions") are not paid until the week after the date that the Wages are paid. So, for example, with respect to the payroll paid on Friday, March 29, 2013, the Employee Contributions and the Debtor's Contributions were not paid until the following week.

29.    EOI utilizes a payroll service, ADP ("ADP"), to process the payment of wages and commissions, including paid vacation, sick and leave pay (collectively, "Wages") to its employees.  In the normal course of its relationship with ADP, the funds necessary for the payment of Wages are transferred to ADP or otherwise made available one (1) day prior to each payroll date (*i.e.*, every other Thursday).  ADP then ensures payment of Wages (either by check or direct deposit into the employees' bank accounts) by the payroll date.

30.    As noted above, on Friday, March 29, 2013, EOI paid Wages to its Employees for the period from March 11, 2013 through and including March 24, 2013, totaling approximately $439,532.23 (not including insiders).  For the period from March 11, 2013 through and including March 24, 2013, EOI paid $9,041.78 in matching contributions under the Employees' 401K Plan the following week after the Wages were paid. On Friday, April 12, 2013, EOI will owe Wages to its Employees for the period from March 25, 2013 through and including April 7, 2013 – all of which will constitute pre-petition obligations. I estimate that the total payroll obligations due on Friday, April 12, 2013, including all payroll taxes, will also be approximately $439,532.23. The foregoing amount will need to be transferred to ADP or otherwise made available by no later than noon on Thursday, April 11, 2013. Further, I estimate that for the period from March 25, 2013 through and including April 7, 2013, EOI will owe approximately $9,041.78 in matching contributions under the Employees' 401K Plan.

31.    EOI is ***not*** seeking authority to pay the pre-petition priority Wages of any employees who are, or may be considered, "insiders" within the definition of Section 101(31) of the Bankruptcy Code.  The list of EOI's Employees, which is attached as **Exhibit "2"** hereto, does not include any "insider" employees of EOI as I understand that term is defined in the

Bankruptcy Code.  Approval to pay compensation to EOI's "insider" employees will be sought pursuant to Notices of Setting Insider Compensation which I understand will be filed with the United States Trustee.

32.    EOI also provides its employees with certain employment and benefit programs comparable to the programs that are typically offered by other employers within the industry. The specific programs offered by EOI are summarized below.

a.    ***Vacation Time And Personal Leave Policy***.  EOI has adopted a paid vacation and sick leave policy for all full-time Employees.  Specifically, regular, full-time employees are eligible to receive a paid vacation and will accrue vacation on a twelve month calendar year basis with monthly accrual to start at the beginning of employment, but employees must complete two (2) full calendar months of employment before any vacation may be scheduled or taken. Paid vacation is accrued on a yearly basis and employees accrue vacation days at a rate of ten (10) days per year for the first five years of employment and then fifteen (15) days after five years of employment.

In addition, all salaried employees are entitled to paid sick leave, which accrues at the rate of 8 sick days per year. Unused sick leave may be carried over from year-to-year up to a maximum of 50 days with no additional accrual once the maximum has been reached. Employees are not permitted to "cash out" their accrued paid vacation or paid sick leave. EOI desires to continue having its existing vacation and sick leave policy in effect and therefore, seeks authority to continue to honor such policy post-petition.

b.    ***Health Insurance Policy.***  EOI offers two different options for health insurance for its non-union employees. In summary, EOI offers a choice of an Aetna HMO plan (the "HMO Plan") or an Aetna PPO Plan (the "PPO Plan") for its medical and dental benefits. In addition to the foregoing plans, the union employees[3] also have the option of choosing a Kaiser HMO plan. Additionally, EOI offers vision benefits through Blue View

---

[3] EOI currently employs 27 employees that are members of the United Steelworkers International Union.

Vision provided by Anthem Blue Cross of California. In summary, EOI's policy is to subsidize 75% of the premiums for medical, dental and vision insurance coverage for its Employees and dependents. In addition, EOI subsidizes 100% of the premiums for life insurance coverage for the Employees. EOI desires to continue having this health insurance policy in effect and therefore, seeks authority to continue to honor such policy post-petition. Additionally, EOI desires to continue having this life insurance coverage and continue to subsidize 100% of the premiums for life insurance coverage for the Employees.

        c.     ***401(K) Plan Contribution Policy.***  EOI offers regular, full-time employees after six (6) months of employment the opportunity to participate in EOI's 401(k) plan with entry permitted on quarterly enrollment dates. The 401(k) plan allows eligible employees to contribute up to 15% of their gross wages or the current IRS maximum (whichever is less) to the 401(k) plan through payroll deductions. EOI will match the employee's contributions at the rate of 50%, but only up to a maximum of 6% of the Employee's gross wages. Both the employee's contributions and EOI's matching contributions to the 401(k) are invested in employee-participant directed accounts.  The matching contributions are submitted by EOI to the 401(k) administrator on a bi-weekly basis.

        33.    The source of the funds to be used to pay and/or honor the pre-petition Wages and to continue honoring EOI's employment and benefit policies will be EOI's revenue and/or financing received by the Debtors pursuant to the DIP Loan Documents. Based on the Initial Approved Budget submitted in connection with the DIP Motion filed concurrently herewith, I do not believe that approval to pay and/or honor the Employees' Wages will render EOI's bankruptcy estate administratively insolvent.

        34.    All of the Employees included in the list of EOI's Employees, which is attached as **Exhibit "2"** hereto, are still employed by EOI.

        35.    I believe that significantly all of the Employees will quit if they are not paid their salaries and benefits in full in a timely fashion.  This is particularly true given that the vast majority of the Employees are paid on an hourly basis.  Such employees would have little

incentive to continue working for EOI and could go out and acquire new employment elsewhere. As a company specializing in oil waste collection and refinement, it is crucial for EOI to retain a sufficient number of qualified and experienced full-time and part-time Employees to maintain its business operations, particularly as the Debtors pursue an expedited marketing and sale process for the Debtors' Assets.  EOI must retain the Employees to continue its business operations without interruption and to preserve and maximize the value of its assets during its bankruptcy case.   EOI's personnel are familiar with EOI's operations, and are thus essential to the preservation of EOI's business.  EOI's failure to pay pre-petition Wages to its Employees or to honor EOI's employment and benefit programs will likely result in Employees quitting (without an ability to quickly or cost-effectively replace such Employees), and will result in severe disruptions to EOI's business operations, to the detriment of creditors.  EOI's ability to preserve the full value of its business and assets depends upon EOI's continued business operations, which cannot occur without the efforts of EOI's Employees.

36.    In order to attract and retain the Employees, EOI maintains what I believe are competitive and reasonable employment and benefit policies.  I believe that maintaining good relationships with, and the morale of, the Employees requires continuing to honor the employment and benefit policies currently in effect for the Employees.

37.    All of the Employees' claims for pre-petition Wages and the Debtor's Contributions are within the $11,725 limit which I am informed is established by the Bankruptcy Code

38.    Based on the current operations and cash flow projections for EOI and the Initial Approved Budget, I do not believe that the payment of pre-petition priority claims for the Employees' Wages and the honoring of employment and benefit policies will render EOI's bankruptcy estate administratively insolvent.

///

///

///

12

**E.    The Utility Motion.**

39.    In connection with the operation of its business, EOI receives water, gas, electricity, telephone, internet and/or similar utility services from a number of utility companies (each a "Utility Company," and collectively, the "Utility Companies").  Given the importance of the services provided by the Utility Companies to the operation of EOI's business, it is crucial that the means of providing adequate assurance to the Utility Companies that provide utility services to the Facilities be determined promptly so that there is no interruption in the services provided.

40.    EOI owns the two Facilities (one located in Newark, California and the second located in Carson, California) and leases its corporate offices located at 2415 Campus Drive, Suite 225, Irvine, California 92612.

41.    Attached hereto as **Exhibit "3"** is a list which sets forth, on an account-by-account basis, the name and address of each Utility Company that is currently providing utility services to EOI's Facilities and EOI's corporate offices, the type of utility service provided by each Utility Company, the account number with each Utility Company, and the amount of the cash deposit proposed to be paid to each Utility Company as adequate assurance of payment.

42.    The total aggregate amount of the cash deposits proposed to be paid to the Utility Companies by EOI, collectively, is $252,211.60.  Generally, for each account with a Utility Company, EOI is proposing to provide the Utility Company with a cash deposit in an amount equal to the average monthly payment based on payments historically made on such account. The methodology used to determine the proposed deposits was to average the monthly payments based on the total amount incurred in the last three months or where the bills for a particular Utility Company were sent on a bi-monthly basis the average was based on the total amount incurred in the last six months (the last three bi-monthly bills).

43.    In addition to the foregoing cash deposits, the Utility Companies will be kept current on all post-petition debts owed to such Utility Companies.

44.    The source of the funds to be used to pay the proposed cash deposits to the Utility Companies will be EOI's revenue and/or financing received by the Debtors pursuant the DIP Loan

Documents. Based on the Initial Approved Budget submitted in connection with the Debtors' DIP

Financing Motion, I do not believe that the payment of the proposed utility deposits will render

EOI's bankruptcy estate administratively insolvent.

**F.      The Vendor Programs Motion.**

45.      In connection with the purchase and collection of used motor oil from its oil

suppliers, for every gallon EOI collects, EOI issues a rebate to its oil suppliers in a particular

amount that is set by a contract entered into between EOI and each particular oil supplier (the

"Rebates").

46.      The collection of the used motor oil is necessary to the operation of EOI's business

because it provides EOI with the used oil which EOI, in turn, takes and refines into lube oil for

resale. Additionally, EOI has entered into contracts with other critical refinery vendors that are

critical to the refining process and to producing the lube oil for resale.

47.      If EOI does not honor the Rebates and the contracts with its other critical refinery

vendors in the ordinary course of its business, I believe that its oil suppliers will likely sell their

used motor oil to competing refiners and its critical refinery vendors will likely refuse to provide

goods and/or services to EOI.  In other words, EOI will lose a significant amount of oil suppliers

and critical refinery vendors if it is not able to honor the Rebates and pay the critical refinery vendor

contracts, which will lead to EOI having a lack of supply of used motor oil to refine into lube oil

and hinder EOI's ability to produce lube oil.

48.      As noted above, EOI intends to market and sell the Assets; therefore, EOI needs to

maintain its business operations and preserve the value of its assets, which in turn, requires EOI to

retain its relationships with its existing oil suppliers and critical refinery vendors.

49.      Additionally, I anticipate that the filing of EOI's bankruptcy case will cause some

consternation among its oil suppliers and critical refinery vendors and other parties in interest within

the oil refining marketplace. EOI's oil suppliers and critical refinery vendors will understandably be

concerned that EOI will not continue to honor its Rebates and critical refinery vendor contracts due

to its financial condition.  EOI's oil suppliers and critical refinery vendors may also question

1   whether EOI will ultimately be forced to liquidate or will be able to successfully reorganize.  I

2   believe that the most effective way to counter these perceptions and concerns within EOI's industry

3   is to continue to honor the Rebates and the critical refinery vendor contracts in the ordinary course

4   of EOI's business, up to a capped amount of $600,000, and in accordance with the Initial Approved

5   Budget and Interim Order, at least in the immediate term.

6          50.    To the extent EOI has funds available, EOI's ordinary business practice is to pay the

7   Rebates to its oil suppliers during the month after EOI purchases used motor oil from a particular oil

8   supplier.  I estimate that, as of Petition Date, there are approximately $2,766,720.96 in Rebates

9   outstanding which have not yet been paid to EOI's oil suppliers, all of which arose from oil

10  purchases made since the beginning of 2012.

11         51.    I believe that the preservation of EOI's relationships with its oil suppliers and critical

12  refinery vendors is essential to preserve the value of the Assets, pending the consummation of the

13  sale of such Assets. I believe that honoring the Rebate claims and critical refinery vendor contracts

14  will help preserve the value of the Debtors' estates by counteracting a great deal of negative

15  publicity and the loss of oil suppliers and critical refinery vendors.  A loss of oil suppliers and

16  critical refinery vendors would severely damage EOI's reputation and value and would hinder the

17  Debtors' efforts to market and consummate the sale of the Assets.

18  **G.    Cash Management Motion.**

19         52.    Prior to the Petition Date, EOI maintained a total of twelve (12) bank accounts at

20  various banks, including Bank of the West, Wells Fargo, Union Bank and Bank of New York.

21  Pursuant to the Cash Management Motion, EOI seeks to maintain and keep open the following two

22  (2) bank accounts (the "Maintained Bank Accounts") postpetition:

23                •   Bank of the West Account Number ending in 4917; and

24                •   Wells Fargo Bank Account Number ending in 2911.

25         53.    The Maintained Bank Accounts currently receive automatic payments from over one

26  hundred (100) of EOI's customers. Currently, EOI uses the Maintained Bank Accounts to receive

27  automatic payments from customers and to make general operating disbursements. However,

28

pursuant to the Cash Management Motion, EOI is seeking only to maintain and keep open the Maintained Bank Accounts for the purpose of receiving automatic payments from its customers, and not to make disbursements from such accounts. All of the funds deposited into the Maintained Bank Accounts will be transferred, in their entirety, to EOI's debtor-in-possession bank accounts, from which EOI will make any necessary disbursements.

54.     The Maintained Bank Accounts (and the automatic transfers set up to allow EOI's customers to make payments directly into the Maintained Bank Accounts) have been utilized by EOI for the collection of customer payments for some time and provide a very efficient and secure means of collecting and managing payments from many of EOI's customers.

55.     I believe that EOI's transition into Chapter 11 will be significantly less disruptive if EOI is permitted to keep open the two Maintained Bank Accounts for the sole purpose of accepting customer payments. EOI will close out all of its other pre-petition bank accounts and open new debtor-in-possession accounts.

56.     I submit that the relief requested in the Cash Management Motion, if granted, will: (i) ensure the uninterrupted receipt of payments from EOI's numerous customers, (ii) minimize the disruption which would result from being forced to assist customers in redirecting their payments, (iii) allow for the fluid continuance of EOI's business transactions, including the payment of critical operating expenses, and (iv) assist in EOI's smooth transition into Chapter 11.  The confusion and potential disruption to EOI's cash flow that would otherwise result, absent the relief requested in the Cash Management Motion, would ill serve EOI's reorganization efforts.

///

///

///

///

///

///

///

16

1   I declare under penalty of perjury that the foregoing is true and correct to the best of my

2 knowledge. Executed on this 9th day of April, 2013, at Irvine, California.

3

4

5

6            WILLIAM SCOTTINI

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>EXHIBIT "1"</u>**

[Interim Order]

1  DAVID L. NEALE (SBN 141225)
   JULIET Y. OH (SBN 211414)
2  LINDSEY L. SMITH (SBN 265401)
3  LEVENE, NEALE BENDER, YOO & BRILL L.L.P.
   10250 Constellation Blvd., Suite 1700
4  Los Angeles, CA 90067
   Tel:  (310) 229-1234
5  Fax:  (310) 229-1244
6  dln@lnbyb.com, jyo@lnbyb.com, lls@lnbyb.com
   Proposed Counsel for Debtors and Debtors in Possession
7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    SANTA ANA DIVISION

11

| 12 | In re | ) | Case No. 8:13-bk-13163-SC |
|----|-------|---|---------------------------|

12  In re                                    )   Case No. 8:13-bk-13163-SC
                                             )
13  EVERGREEN OIL, INC.,                     )   Jointly Administered With:
                                             )   Case No. 8:13-bk-13168
14                          Debtor.          )
                                             )   Chapter 11
15  Jointly Administered Debtors             )
16  And Debtors-in-Possession               )   **INTERIM ORDER (I) AUTHORIZING THE**
                                             )   **DEBTORS TO (A) OBTAIN**
17  Affects:                                 )   **POSTPETITION FINANCING PURSUANT**
                                             )   **TO 11 U.S.C. §§ 105, 361, 362, 364(c),**
18  ☐ Evergreen Oil, Inc., Only             )   **364(d)(1), AND 364(e), AND (B) UTILIZE**
    ☐ Evergreen Environmental Holdings,      )   **CASH COLLATERAL OF PREPETITION**
19     Inc., Only                            )   **SECURED ENTITIES PURSUANT TO 11**
    ☒ All Debtors                            )   **U.S.C. § 363; (II) GRANTING ADEQUATE**
20                                           )   **PROTECTION TO PREPETITION**
                                             )   **SECURED LENDERS PURSUANT TO 11**
21                                           )   **U.S.C. §§ 361, 362, 363, AND 364; (III)**
                                             )   **SCHEDULING A FINAL HEARING**
22                                           )   **PURSUANT TO BANKRUPTCY RULES**
                                             )   **4001(b) AND 4001(c); AND (IV) GRANTING**
23                                           )   **RELATED RELIEF**
                                             )
24                                           )
                                             )
25                                           )   DATE:      April 10, 2013
                                             )   TIME:      3:30 p.m.
26                                           )   PLACE:   Courtroom "5C"
                                             )                411 West Fourth Street
27                                           )                Santa Ana, California
                                             )
28  _____ )

Upon the motion of Evergreen Oil, Inc. ("EOI") and Evergreen Environmental Holdings, Inc. ("EEHI," and together with EOI, the "Debtors") as Debtors-in-possession in the above-captioned Chapter 11 Cases (the "Chapter 11 Cases), dated April 9, 2013 (the "Motion"), for entry of an interim order (this "Interim Order") and a final order (as defined in the DIP Credit Agreement (as defined below), a "Final Order"), under sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "Local Rules"), seeking, among other things:

(i)      authorization for EOI to obtain post-petition financing in the form of delayed draw term loans in the aggregate principal amount not to exceed $6,000,000 (the "DIP Loans"), drawn under a debtor-in-possession credit facility (the "DIP Facility") and for EEHI to guarantee unconditionally EOI's obligations in connection with the DIP Facility[1], pursuant to the terms of this Interim Order and subject to the terms and conditions of the DIP Loan Documents (as defined below);

(ii)      authorization for the Debtors to execute and enter into that certain DIP Credit Agreement, by and among EOI, the Guarantors, and Guggenheim Private Debt Fund Note Issuer, LLC as the lender party thereto (the "DIP Lender"), (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement", and together with any related documents and instruments delivered pursuant to or in connection therewith, collectively, the "DIP Loan Documents"), which shall be substantially similar to the form attached hereto as Exhibit A;

(iii)      approval of the terms thereof, and authorization for the Debtors to execute and

---

[1] EEHI's parent company, Evergreen Holdings, Inc., a non-debtor entity, is also a guarantor of EOI's Obligations under the Prepetition Loan Documents (as defined below), and shall remain a guarantor of the DIP Facility. EEHI and Evergreen Holdings, Inc. are each referred to as a "Guarantor" and collectively, as the "Guarantors."

enter into the DIP Loan Documents (which shall be in a form and substance acceptable to the DIP Lender) and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(iv)    authorization for the Debtors' use of proceeds of the DIP Facility and cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code, and the collection and application of cash collateral, in accordance with the terms and conditions set forth in this Interim Order and the DIP Credit Agreement, as applicable;

(v)    the grant of (i) valid, enforceable, non-avoidable and fully perfected first priority priming liens on and senior security interests in (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code) all DIP Collateral (as defined below) to the DIP Lender to secure all obligations of the Debtors under and with respect to the DIP Facility (collectively, the "DIP Obligations"), and (ii) superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code) to the DIP Lender having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, but excluding Avoidance Actions Proceeds (as defined below), and any of the Debtors' rights under section 506(c) of the Bankruptcy Code and the proceeds thereof;

(vi)    the grant of adequate protection to the Prepetition Secured Parties (as defined below) under that certain Amended and Restated Credit Agreement, dated as of August 3, 2011 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "Prepetition Credit Agreement"), among EOI, the Lenders from time to time party thereto (the "Prepetition Lenders"), and Guggenheim, as administrative agent (in such capacity, the "Prepetition Agent", and together with the Prepetition Lenders, the "Prepetition Secured Parties"), on account of (i) the Debtors' use of cash collateral as defined in 11 U.S.C. § 363(a) (as so defined, "Cash Collateral"), and (ii) the priming of the liens and security interests held by the Prepetition Agent on behalf of itself and the Prepetition Secured Parties under the Prepetition Credit Agreement and all security agreements, pledge agreements, mortgages, deeds of trust and other security and

ancillary documents executed by EOI or any Guarantor (as defined in the Prepetition Credit Agreement) in favor of the Prepetition Agent (on behalf of itself and the Prepetition Secured Parties) in connection therewith (collectively, the "Prepetition Collateral Documents" and, together with the Prepetition Credit Agreement, the "Prepetition Loan Documents"), as more fully set forth in this Interim Order;

(vii)    the grant of rights under section 552(b) of the Bankruptcy Code, including a determination that the "equities of the case" exception under section 552(b) shall not apply;

(viii)    subject to entry of a Final Order, the waiver by the Debtors of any right to surcharge the Prepetition Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code or other applicable law, and (ii) ;

(ix)    pursuant to Bankruptcy Rule 4001, the scheduling of an interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of this Interim Order, which, among other things, (i) authorizes EOI to obtain from the DIP Lender DIP Loans of up to $4,000,000 drawn under the DIP Facility on an interim basis, (ii) authorizes the Debtors' use of the Cash Collateral; (iii) authorizes the Guarantors to guaranty the DIP Obligations, and (iv) grants the liens and claims provided for herein;

(x)    the scheduling of a final hearing (the "Final Hearing") on the Motion no later than the thirtieth (30th) day following the entry of this Interim Order to consider entry of a Final Order granting the relief requested in the Motion on a final basis;

(xi)    modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors, the DIP Lender, the DIP Lender, the Prepetition Lenders, and the Prepetition Agent to implement the terms of this Interim Order; and

(xii)    waiver of any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order.

Upon due and sufficient notice of the Motion and Interim Hearing having been provided by the Debtors; and after considering all the pleadings filed with this Court; and upon the record made by the Debtors at the Interim Hearing; and the Court having found and determined that the relief

1  sought in the Motion on an interim basis is in the best interests of the Debtors, their estates,

2  creditors, and all parties in interest; and after due deliberation and consideration and good and

3  sufficient cause appearing therefor,

4  **THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND**

5  **CONCLUSIONS OF LAW:**

6      A.    **Petition Date**. On April 9, 2013 (the "Petition Date"), the Debtors filed their

7  respective voluntary petitions (collectively, the "Petitions") with this Court commencing these

8  Chapter 11 Cases.  The Debtors are continuing to operate their respective businesses and manage

9  their respective properties as Debtors in Possession pursuant to sections 1107 and 1108 of the

10  Bankruptcy Code.

11      B.    **Jurisdiction; Venue**.  This Court has subject matter jurisdiction to consider this

12  matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §

13  157(b).  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364,

14  503, 507 and 552 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(b) and 9014 and Local

15  Rule 4001-2.  Venue of these Chapter 11 Cases and the Motion in this District is proper pursuant to

16  28 U.S.C. §§ 1408 and 1409.

17      C.    **Notice**.  The Interim Hearing is being held pursuant to the authorization of

18  Bankruptcy Rule 4001 and Local Rule 4001-2.  Notice of the Interim Hearing and the emergency

19  relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic

20  mail, overnight courier or hand delivery, on April 9, 2013, to certain parties in interest, including:

21  (a) the Office of the United States Trustee for the Central District of California, (b) the 20 largest

22  non-insider unsecured creditors of each of the Debtors, (c) Guggenheim, as DIP Lender and

23  Prepetition Agent, (d) Sidley Austin, LLP, as counsel to the DIP Lender and the Prepetition Agent,

24  and (e) all other parties known by the Debtors to assert liens or security interests in the assets of the

25  Debtors (collectively, the "Noticed Parties").  Under the circumstances, such notice of the Motion,

26  the relief requested therein and the Interim Hearing complies with Bankruptcy Rule 4001(b), (c) and

27  (d) and the Local Rules.

28

5

D.    **Debtors' Stipulations With Respect to Prepetition Obligations**.  The Debtors and the Guarantors hereby admit, acknowledge, agree and stipulate that (collectively, the "Debtors' Stipulations"):

    1.    As of the Petition Date, the Debtors and Guarantors were truly and justly indebted to the Prepetition Secured Parties pursuant to the Prepetition Loan Documents, without defense, counterclaim or offset of any kind, in the aggregate amount of no less than $66,242,734.27 outstanding under the Term Loans (as defined in the Prepetition Credit Agreement), which includes accrued and unpaid interest with respect thereto, plus any additional fees, costs and expenses (including any attorneys', financial advisors' and other professionals' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents) due under the Prepetition Loan Documents.  All obligations of the Debtors and the Guarantors arising under the Prepetition Loan Documents (including, without limitation, the "Obligations" as defined in the Prepetition Credit Agreement) shall collectively be referred to herein as the "Prepetition Obligations";

    2.    the first priority liens and security interests granted to the Prepetition Agent (on behalf of itself and the Prepetition Secured Parties) (collectively, the "Prepetition First Priority Liens") in substantially all of the Debtors' and Guarantors' assets (the "Prepetition Collateral") as more particularly described in the Prepetition Collateral Documents are (i) valid, binding, perfected and enforceable liens and security interests in the real and personal property described in the Prepetition Collateral Documents; (ii) not subject to, pursuant to the Bankruptcy Code or other applicable law, avoidance, disallowance, reduction, recharacterization, recovery, subordination, attachment, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind;

6

3.    (a) the Prepetition Obligations constitute legal, valid and binding Obligations (as defined in the Prepetition Credit Agreement) of the Debtors and the Guarantors; (b) no offsets, defenses or counterclaims to the Prepetition Obligations exist; (c) no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Loan Documents are valid and enforceable by the Prepetition Agent for the benefit of the Prepetition Secured Parties against each of the applicable Debtors and the Guarantors; (e) the liens and security interests of the Prepetition Agent and the other Prepetition Secured Parties constitute valid, binding, enforceable and perfected liens in and to the Prepetition Collateral, having the priority set forth in the Prepetition Loan Documents and subject only to "Non-Primed Liens"[2] that are valid, perfected, and enforceable as of the Petition Date and senior in priority to the liens and security interests of the Prepetition Agent and Prepetition Secured Parties in the Prepetition Collateral, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Prepetition Obligations constitute allowed claims against each of the Debtors' estates; and (g) no claim of or cause of action held by the Debtors, the Guarantors or any of their estates exists against the Prepetition Agent, the other Prepetition Secured Parties or their agents, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising

---

[2] Nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtors, the DIP Lender, and the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such liens and/or security interests.

7

1    under or in connection with any of the Prepetition Loan Documents (or the

2    transactions contemplated thereunder), Prepetition Obligations or Prepetition

3    First Priority Liens, including without limitation, any right to assert any

4    disgorgement or recovery; and

5    4.    all of the Debtors' cash, including any cash in the deposit accounts, wherever

6    located, constitutes Cash Collateral of the Prepetition Agent and the other

7    Prepetition Secured Parties.

8    E.    **Budget for DIP Facility**.  Attached hereto as **Exhibit B** is a cash flow forecast

9  setting forth all projected cash receipts and cash disbursements (by line item) on a monthly basis (the

10  "Initial Approved Budget") for the period beginning on the Petition Date through and including the

11  Scheduled Maturity Date.[3]  The Initial Approved Budget may be modified or supplemented from

12  time to time by additional budgets (covering any time period covered by a prior budget or covering

13  additional time periods) prepared by the Debtors and approved by the DIP Lender, without

14  subsequent notice to or order of the Court (each such additional budget, a "Supplemental Approved

15  Budget" and together with the Initial Approved Budget, the "Approved Budget"), in accordance with

16  the terms of the DIP Credit Agreement.  The Initial Approved Budget is an integral part of this

17  Interim Order and has been relied upon by the DIP Lender and the Prepetition Secured Parties in

18  consenting to this Interim Order, to provide the DIP Facility and to permit the use of the Cash

19  Collateral.  The Debtors represent and warrant to the DIP Lender, the Prepetition Secured Parties

20  and this Court that the Approved Budget includes and contains the Debtors' best estimate of all

21  operational receipts and all operational disbursements, fees, costs and other expenses that will be

22  payable, incurred and/or accrued by the Debtors during the period covered by the Approved Budget

23  and that such operational disbursements, fees, costs and other expenses will be timely paid in the

24  ordinary course of business pursuant to and in accordance with the Approved Budget unless such

25  operational disbursements, fees, costs and other expenses are not incurred or otherwise payable.  The

26

---

27  [3] All defined terms shall have the meaning ascribed to them in DIP Credit Agreement (as defined below) unless otherwise defined herein.

28

Debtors further represent that the Initial Approved Budget is achievable and will allow the Debtors to operate in these Chapter 11 Cases and pay postpetition administrative expenses as they come due. In accordance with the DIP Credit Agreement, the Debtors shall be required to provide to the DIP Lender, among other things, a weekly report of actual cash receipts and disbursements on a consolidated basis, a weekly variance report (the "Budget Variance Report") comparing the actual cash receipts and disbursements of the Debtors on a consolidated basis for such calendar week with the projections in the Approved Budget, a monthly updated budget in form and scope similar to the Initial Approved Budget for the period through the Scheduled Maturity Date, and a monthly balance sheet and statement of income.  The Debtors shall be permitted to deviate from the Initial Approved Budget, without the need for any further Court order, as follows: (i) the aggregate cash receipts of the Debtors, on a weekly basis, may deviate from the cash receipts projected in the Initial Approved Budget for such period, by up to 15%; and (ii) the aggregate operating cash disbursements of the Debtors, on a weekly basis, may deviate from the operating cash disbursements projected in the Initial Approved Budget for such period, by up to 15%.  Any deviations beyond the forgoing shall be permitted, without the need for any further Court order, only if the Debtors obtain the prior written consent of the DIP Lender.

F.    **Immediate Need for Funding**.  The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility and authorized use of Cash Collateral.  As a result of the Debtors' financial condition, the use of Cash Collateral alone will be insufficient to meet the Debtors' immediate postpetition liquidity needs.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, pay their employees, purchase and supply new inventory and otherwise finance their operations post-petition is essential to maintaining the going-concern value of the Debtors and the Debtors' ability to maximize the value of the assets of their estates, including through the financing of a sale process for all or substantially all of the Debtors' assets.  In the absence of the DIP Facility and the authority of this Court to use Cash Collateral, the Debtors' businesses and estates would suffer immediate and irreparable harm, including, without limitation, a cessation of substantially all

of their operations.  The preservation, maintenance and enhancement of the going concern value of the Debtors are of the utmost significance and importance to a successful restructuring of the Debtors under chapter 11 of the Bankruptcy Code.

G.  **No Credit on More Favorable Terms**.  The Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lender on terms and subject to conditions more favorable than under the DIP Facility and the DIP Loan Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Credit Agreement without the Debtors' (i) granting to the DIP Lender, subject to the Carve-Out (as defined below), (x) the DIP Superpriority Claims (as defined below) and (y) the DIP Liens in the DIP Collateral, as provided herein and in the DIP Loan Documents; and (ii) providing the Prepetition Secured Parties the adequate protection as provided herein.

H.  **Reasonable; Good Faith**.  The DIP Lender has indicated a willingness to provide the Debtors with post-petition secured financing but solely on the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the DIP Facility to be provided by the DIP Lender and the authorization to use the Cash Collateral to be provided by the Prepetition Agent represents the best financing presently available to the Debtors.  Accordingly, the Debtors represent that (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors, the DIP Lender and (iii) any credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Lender have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.  The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent

granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim Order and the DIP Loan Documents are, therefore, in the best interests of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

I.    **Use of Cash Collateral**. An immediate and critical need exists for the Debtors to use the Cash Collateral (in addition to the DIP Facility) to continue to operate their businesses, pay wages, maintain business relationships with vendors, suppliers and customers, make adequate protection payments and generally conduct their business affairs so as to avoid immediate and irreparable harm to their estates and the value of their assets.

J.    **Consent by Prepetition Secured Parties**. The Prepetition Secured Parties, at the direction of the Prepetition Agent, have consented to, conditioned on the entry of this Interim Order (i) the financing arrangements contemplated by this Interim Order and the DIP Loan Documents, and (ii) Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order and the DIP Credit Agreement, and such consent is binding on all Prepetition Secured Parties.

K.    **Adequate Protection**. The adequate protection provided to the Prepetition Secured Parties for any diminution in the value of such parties' respective interests in the Prepetition Collateral from and after the Petition Date, including, without limitation, as a result of the priming of the Prepetition First Priority Liens and use of the Cash Collateral, pursuant to the provisions of this Interim Order, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Prepetition Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code. The consent of the Prepetition Agent on its own behalf and on behalf of the Prepetition Secured Parties to the priming of their liens by the DIP Liens does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Prepetition Secured Parties that their respective interests in the Prepetition Collateral are adequately protected pursuant to this Interim Order or otherwise. The adequate protection provided herein and

other benefits and privileges contained herein are necessary in order to (i) protect the Prepetition

Secured Parties from the diminution in value of their Prepetition Collateral and (ii) obtain the

foregoing consents and agreements.

L.      **Good Cause Shown; Best Interests**.  The Debtors have requested immediate entry

of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this

Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably

harmed.  Good cause has been shown and entry of this Interim Order is in the best interest of the

Debtors' estates and creditors as its implementation will, among other things, allow for the continued

operation of the Debtors' existing businesses and enhance the Debtors' prospects for the successful

sale of all or substantially all of their assets pursuant to any subsequent orders of this Court.

M.      **No Liability to Third Parties**.  The Debtors stipulate that in making decisions to

advance loans to the Debtors, in administering any loans, in permitting the Debtors to use Cash

Collateral, in accepting the Initial Approved Budget or any future Supplemental Approved Budget or

in taking any other actions permitted by this Interim Order or the DIP Loan Documents, none of the

DIP Lender nor the Prepetition Secured Parties shall be deemed to be in control of the operations of

the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the

operation or management of the Debtors.

N.      **Section 552**.  In light of the subordination of their liens and super-priority

administrative claims (i) in the case of the DIP Lender, to the Carve-Out and the Non-Primed Liens

and (ii) in the case of the Prepetition Secured Parties to the Carve-Out, the DIP Liens and the Non-

Primed Liens, each of the DIP Lender and Prepetition Secured Parties is entitled to all of the rights

and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall

not apply.

Based on the foregoing, and upon the record made before this Court at the Interim Hearing,

and good and sufficient cause appearing therefor,

/ / /

/ / /

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    **Approval of Interim Order**.  The Motion is approved on the terms and conditions set forth in this Interim Order.  Any objections that have not previously been withdrawn are hereby overruled.  This Interim Order shall become effective immediately upon its entry.

2.    **Approval of DIP Loan Documents; Authority Thereunder**.  The Debtors are expressly authorized and empowered to execute and deliver, and on such execution and delivery, directed to perform all of their obligations under the DIP Loan Documents, including the DIP Credit Agreement, and such additional documents, instruments and agreements as may be required or requested by the DIP Lender pursuant to the DIP Credit Agreement to implement the terms or effectuate the purposes of this Interim Order.  The Debtors are authorized to comply with and perform all of the terms and conditions contained therein, and directed to repay amounts borrowed, together with interest, fees and premiums (as applicable) thereon and any other outstanding DIP Obligations to the DIP Lender in accordance with and subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.  In the event of any inconsistency between the DIP Loan Documents and this Interim Order, this Interim Order shall control.

3.    **Authorization to Borrow/Use Cash Collateral**.  Upon executing the DIP Credit Agreement and the other DIP Loan Documents, (a) the Debtors are immediately authorized to borrow up to an aggregate maximum principal amount not to exceed $6,000,000 of DIP Loans, and (b) the Guarantors are immediately authorized to guarantee the DIP Obligations.  The Debtors are authorized to use the proceeds of the DIP Facility and the Cash Collateral in the operation of the Debtors' business, provided, that any proposed use of proceeds of the DIP Facility or use of Cash Collateral is consistent with the terms of the DIP Loan Documents, the Approved Budget and this Interim Order.  Authorization to use Cash Collateral will terminate upon the Scheduled Maturity Date (as defined in the DIP Credit Agreement) unless terminated earlier pursuant to the terms of the DIP Credit Agreement or this Interim Order.

4.    **Collections and Disbursements.**  From the Petition Date until the DIP Obligations have been paid in full in cash, all cash receipts, Cash Collateral and all proceeds from the sale or

13

other disposition of the DIP Collateral and all other proceeds of such collateral of any kind which is now or shall come into the possession or control of the Debtors, or to which the Debtors are now or shall become entitled, shall be promptly deposited only into accounts upon which the Prepetition Agent has perfected Prepetition First Priority Liens and such collections and proceeds shall be subject to all of the security interests and liens of the DIP Lender (subject to any further orders of the Court) and shall be treated in accordance with this Interim Order and the DIP Credit Agreement.  As set forth in section 3(d) of the DIP Credit Agreement, and subject to ¶ 16 below, all such collections and proceeds shall be transferred to the DIP Lender and applied as follows:

        a.     first, to payment of costs and expenses of the DIP Lender or DIP Lender payable or reimbursable by EOI;

        b.     second, to payment of attorney costs of DIP Lender or DIP Lender payable or reimbursable by EOI;

        c.     third, to payment of all accrued and unpaid interest under the DIP Facility;

        d.     fourth, to payment of principal owing under the DIP Facility;

        e.     fifth, to payment of any other amounts outstanding under the DIP Facility; and

        f.     sixth, to payment of all Prepetition Obligations.

     5.    **Perfection in Cash.**  Subject to the Carve-Out and other provisions of this Interim Order, all financial institutions in which the Debtors' accounts are located are authorized and directed to comply with any request of the DIP Lender to turn over to the DIP Lender all funds therein without offset or deduction of any kind.  The Debtors are directed to enter into such blocked account agreements with springing cash dominion with the DIP Lender and such financial institutions as the DIP Lender may require, or alternatively, the DIP Lender may enjoy the benefit of all control agreements to which the Prepetition Agent is a party without the need to enter into new blocked account agreements.

     6.    **Interest on DIP Facility.**  The rate of interest to be charged for the DIP Loans and other extensions of credit to the Debtors pursuant to the DIP Credit Agreement shall be ten percent

(10%) per annum (calculated on the basis of a 360-day year for actual days elapsed).  Upon and

during the occurrence of an Event of Default (as defined in the DIP Credit Agreement), outstanding

principal amount of the DIP Loans (including any overdue interest) shall bear interest at twelve

percent (12%) per annum (also calculated on the basis of a 360-day year for actual days elapsed).

All interest shall be payable at the times set forth in the DIP Credit Agreement.

　　　　7.　　**Payment of DIP Fees and Expenses**.  The Debtors are authorized and directed to

pay (i) all fees when due under the DIP Credit Agreement in the amounts set forth in the DIP Credit

Agreement and (ii) costs, expenses and any other fees or other amounts payable under the terms of

the DIP Loan Documents and all other reasonable, documented, out-of-pocket costs and expenses of

the DIP Lender in accordance with the terms of the DIP Loan Documents (including, without

limitation, the reasonable, documented, out-of-pocket prepetition and postpetition fees, costs and

expenses of legal counsel, financial advisors, and other third-party appraisers, advisors and

consultants advising the DIP Lender).  None of such fees, costs and expenses shall be subject to

Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to

file with respect thereto any interim or final fee application with this Court.  In addition, the Debtors

are hereby authorized and directed to indemnify the DIP Lender (and each of its respective directors,

officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons)

against any liability arising in connection with the DIP Loan Documents, to the extent set forth in the

DIP Loan Documents.  All such unpaid fees, costs and expenses and indemnities of the DIP Lender

shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to

the DIP Obligations under this Interim Order and the DIP Loan Documents.

　　　　8.　　**Validity of DIP Loan Documents**.  Upon execution and delivery of the DIP Loan

Documents, the DIP Loan Documents shall constitute, and are hereby deemed to be the legal, valid

and binding obligations of each of the Debtors party thereto, enforceable against each of the Debtors

in accordance with the terms of the DIP Loan Documents and the terms of this Interim Order for all

purposes during these Chapter 11 Cases, in any subsequently converted Chapter 11 Case of the

Debtors under chapter 7 of the Bankruptcy Code or after dismissal of any of these Chapter 11 Cases.

15

Any DIP Loans advanced under the DIP Credit Agreement until the Final Hearing will be made only to fund postpetition administrative expenses, the Debtors' working capital and marketing and sale efforts, and to pay such other amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Interim Order and any other orders of this Court, all subject to and in accordance with the Approved Budget. No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

9. **DIP Superpriority Claims**. In accordance with Bankruptcy Code section 364(c)(1), the DIP Obligations shall constitute superpriority administrative expense claims (the "DIP Superpriority Claims") against the Debtors with priority in payment over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of these Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the Carve-Out (as defined below). The DIP Superpriority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and severable basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, subject to and upon entry of the Final Order. Except as set forth in this Interim Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

10. **DIP Liens**. As security for the DIP Obligations, the DIP Lender is hereby granted,

subject only to payment of the Carve-Out, (effective upon the date of this Interim Order, without the

necessity of the execution by the Debtors or the filing or recordation of mortgages, security

agreements, lock box or control agreements, mortgages, financing statements, or any other

instruments or otherwise) valid, binding and fully perfected, security interests in, and liens upon (the

"DIP Liens"), all present and after-acquired property of the Debtors of any nature whatsoever

(including, without limitation, "Collateral" (as defined in the DIP Credit Agreement), all cash and

cash equivalents contained in any account maintained by the Debtors, but excluding all Avoidance

Actions of the Debtors or their estates and any proceeds thereof) (collectively, with all proceeds and

products of any or all of the foregoing, the "DIP Collateral" and, together with the Prepetition

Collateral, the "Collateral"), such DIP Liens to consist of:

      a.    First Lien on Cash Balances and Unencumbered Property.  Pursuant to section

364(c)(2) of the Bankruptcy Code, a continuing, enforceable, first priority,

fully-perfected lien and security interest upon all of the Debtors' right, title

and interest in, to and under all DIP Collateral that is not otherwise

encumbered by a validly perfected security interest or lien on the Petition Date

(collectively, the "Unencumbered Property"); provided, however, that

Unencumbered Property shall not include the Debtors' claims and causes of

action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the

Bankruptcy Code and any other avoidance actions under the Bankruptcy Code

(collectively, "Avoidance Actions") or the proceeds of the Avoidance Actions

and property received thereby (collectively, the "Avoidance Actions

Proceeds").

      b.    Liens Priming Prepetition Secured Parties' Liens.  Pursuant to section

364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected

lien and security interest upon all of the Debtors' right, title and interest in, to

and under all DIP Collateral that is subject to any existing lien presently

securing the Prepetition Obligations, subject only to Non-Primed Liens (as

17

defined below).  Such security interest shall be senior to and prime the

security interests and liens of the Prepetition Secured Parties on account of the

Prepetition Obligations and the Adequate Protection Liens (as defined below)

granted to the Prepetition Secured Parties, but shall be junior to any Non-

Primed Liens on such property.

c.      Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the

Bankruptcy Code, a junior, perfected lien and security interest (other than as

set forth in clause (d) below) upon all of the Debtors' right, title and interest

in, to and under all DIP Collateral (other than the property described in clause

(a) or (b) of this paragraph 10, as to which liens and security interests in favor

of the DIP Lender will be as described in such clauses), whether now existing

or hereafter acquired, that is subject to (A) any validly perfected and

enforceable security interest or lien in existence as of the Petition Date that is

not subject to section 552(a) of the Bankruptcy Code, or (B) any valid and

enforceable security interest or lien perfected (but not granted) after the

Petition Date (to the extent such perfection in respect of a pre-Petition Date

claim is expressly permitted under the Bankruptcy Code) that is not subject to

section 552(a) of the Bankruptcy Code, in each case that is senior in priority

to the Prepetition First Priority Liens (the "Non-Primed Liens").

d.      Liens Senior to Certain Other Liens.  The DIP Liens and the Adequate

Protection Liens shall not be subject or subordinate to (i) any lien or security

interest that is unperfected or avoided and preserved for the benefit of the

Debtors and their estates under section 551 of the Bankruptcy Code,

(ii) subject to entry of a Final Order, any liens arising after the Petition Date

including, without limitation, any liens or security interests granted in favor of

any federal, state, municipal or other governmental unit, commission, board or

18

court for any liability of the Debtors, or (iii) any intercompany or affiliate liens of the Debtors.

11.     **Prepetition Lenders' Adequate Protection**.  Until the indefeasible repayment of the Prepetition Obligations, the Prepetition Secured Parties are entitled, pursuant to sections 361, 363(c) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral as a result of (a) the provisions of this Interim Order granting first priority and/or priming liens on such Prepetition Collateral to the DIP Lender; (b) the authorization of the use of Cash Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; or (d) otherwise, pursuant to sections 361(a), 363(c) and 364(d)(1) of the Bankruptcy Code.  The Prepetition Agent, on behalf and for the benefit of the Prepetition Secured Parties is hereby granted, solely to the extent of the diminution in value of the Prepetition First Priority Liens in the Prepetition Collateral from and after the Petition Date, the following (collectively, the "Prepetition Adequate Protection Obligations"):

a.     Adequate Protection Liens.  The Prepetition Agent, on behalf and for the benefit of the Prepetition Secured Parties, is hereby granted valid, enforceable, unavoidable and fully perfected replacement liens and security interests in all Collateral to the extent of any diminution in the Prepetition Secured Parties' interest in the Prepetition Collateral, which shall be junior to the DIP Liens and Non-Primed Liens and subject to the Carve-Out (the "Prepetition Adequate Protection Liens").  The Prepetition Adequate Protection Liens shall be deemed to be legal, valid, binding, enforceable, perfected liens, not subject to subordination or avoidance, for all purposes in these Chapter 11 Cases. Except as otherwise set forth in this Paragraph 11 or otherwise in this Interim Order, the Prepetition Adequate Protection Liens shall not be subordinated or be made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise.

b.     Superpriority Claims.  The Prepetition Agent, on behalf and for the benefit of

19

the Prepetition Secured Parties, is hereby granted superpriority administrative expense claims (the "Prepetition Superpriority Claims") under sections 503 and 507 of the Bankruptcy Code against the Debtors' estates, to the extent that the Adequate Protection Liens do not adequately protect against the diminution in value of the Prepetition Collateral, which Prepetition Superpriority Claims, if any, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of these Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; provided that at all times while such claim is in full force and effect pursuant to this Interim Order, the Prepetition Superpriority Claims shall be junior in all respects to the DIP Superpriority Claims and subject to the Carve-Out;

c.    Fees and Expenses.  The Prepetition Agent, on behalf and for the benefit of the Prepetition Secured Parties, shall receive payments in cash from the Debtors on a current basis of all fees, costs and expenses payable to the Prepetition Agent under the Prepetition Credit Agreement as in effect on the Petition Date, including but not limited to, the reasonable fees and disbursements of counsel, financial advisors, and other third-party appraisers, advisors, and consultants for the Prepetition Agent, promptly upon receipt of written invoices therefor (subject in all respects to applicable privilege or work product doctrines) and without the necessity of filing motions or fee applications, including such amounts arising (A) before the Petition Date and (B) after the Petition Date to the extent such amounts arise in connection with these Chapter 11 Cases;

20

d.    Interest.   The Prepetition Agent, on behalf of the Prepetition Secured Parties, is hereby granted, and shall receive, (a) payments in cash from the Debtors on a current basis of all accrued and unpaid interest and fees at the non-default contract rate then owing under the Prepetition Credit Agreement, and (b) current monthly payments of postpetition non-default interest (as set forth in section 2.7 of the Prepetition Credit Agreement) and the administrative agent fees when due and payable under the Prepetition Credit Agreement;

e.    Financial Reporting.  The Debtors shall provide the Prepetition Agent with complete access to any financial advisors retained by the Debtors, and the financial and other reporting as described in the DIP Credit Agreement; provided that if the Debtors do not retain any financial advisors, the Prepetition Agent shall be permitted to retain financial advisors at the expense of the Debtors, which advisors shall be given reasonable access for purposes of monitoring the businesses of the Debtors and the value of the Collateral; and

f.    Right to Seek Additional Adequate Protection.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Agent to request additional forms of adequate protection at any time; provided, however, that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Lender granted under this Order and the DIP Loan Documents.

12.    **No Waiver of Prepetition Credit Agreement Provisions; Reservation of Rights**.

Except as otherwise specifically provided in this Interim Order, nothing contained in this Interim Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Prepetition Credit Agreements by the Prepetition Secured Parties, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtors, the incurrence of any lien

21

1   in connection therewith or the making of any payment by the Debtors.

2          13.    **Carve-Out**.  Upon the occurrence (the "Carve-Out Event") of the earlier of (i) the

3   Debtors' receipt of notice of Event of Default (as such term is defined in the DIP Credit Agreement)

4   and continuance thereof and (ii) the Scheduled Termination Date (as defined in the DIP Credit

5   Agreement), to the extent unencumbered funds are not available to pay administrative expenses in

6   full, the DIP Liens, DIP Superpriority Claims, Prepetition Superpriority Claims, Adequate Protection

7   Liens, and Prepetition First Priority Liens, shall be subject to the payment of (x) the aggregate

8   amount of any budgeted and unpaid fees, costs and expenses that were accrued or incurred prior to

9   the Carve-Out Event by the professionals retained by the Debtors and any professional retained by

10  any official committee of unsecured creditors (the "Committee") that may be appointed in these

11  cases (collectively, the "Professionals") to the extent allowed by an order of this Court, plus

12  (y) those fees, costs and expenses incurred by the Professionals after the Carve-Out Event and

13  subsequently allowed by order of this Court (and, if applicable, in compliance with the Approved

14  Budget) in an amount not to exceed $350,000 in the aggregate, plus (z) fees required to be paid to

15  the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930 (collectively, the

16  "Carve-Out"); provided further that, following a Carve-Out Event, any amounts actually paid to

17  Professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis; and provided,

18  further, that no portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or Cash

19  Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any

20  party, including the Debtors or any Committee, in connection with (i) the initiation or prosecution of

21  any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Lender

22  or the Prepetition Secured Parties, including, without limitation, (a) challenging the amount, validity,

23  extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to

24  the DIP Obligations, DIP Superpriority Claims or security interests and liens of the DIP Lender in

25  respect thereof, (b) challenging the amount, validity, extent, perfection, priority, or enforceability of,

26  or asserting any defense, counterclaim, or offset to the Prepetition Obligations, Prepetition

27  Superpriority Claims, or security interests and liens of the Prepetition Secured Parties in respect

28

thereof or (ii) asserting any claims or causes of action, including, without limitation, claims or causes

of actions to hinder or delay the DIP Lender's assertion, enforcement or realization on the DIP

Collateral in accordance with the DIP Loan Documents or this Interim Order; provided, further,

however, that no more than $10,000 of the proceeds of the DIP Facility or any proceeds of the DIP

Collateral may be used to fund a reasonable investigation by any Committee appointed in these

Chapter 11 Cases into the existence of any causes of action or other type of litigation against the

Prepetition Secured Parties with respect to the Prepetition Obligations.  Notwithstanding the

foregoing, so long as a Carve-Out Event has not occurred: (i) the Debtors shall be permitted to pay,

subject to and in accordance with the Approved Budget, administrative expenses allowed and

payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and

payable; and (ii) such payments shall not be applied to reduce the Carve-Out (to the extent such

payments are ultimately permitted by the Court).  Nothing contained herein is intended to constitute,

nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by

any party and shall not affect the right of the Debtors, DIP Lender, Prepetition Secured Parties,

Committee, U.S. Trustee, or any other party-in-interest to object to the allowance and payment or

any amounts incurred or requested.  Furthermore, none of the Carve-Out, DIP Collateral, Prepetition

Collateral, Cash Collateral or any proceeds of the DIP Facility shall be used to prevent, hinder or

delay the DIP Lender from enforcing or realizing upon the DIP Collateral once an Event of Default

has occurred, or has been determined by the Court to have occurred, and is continuing under the DIP

Loan Documents or this Interim Order.

      14.    **Investigation Rights**.  The Committee shall have until the later of (i) sixty (60) days

from appointment of the Committee or (ii) forty-five (45) days from the entry of the Final Order and

any other non-Debtor parties in interest shall have sixty (60) days from the date of entry of this

Interim Order (each, as applicable, the "Investigation Termination Date"), to investigate the validity,

perfection and enforceability of the Prepetition First Priority Liens and the Prepetition Obligations,

or to assert any other claims or causes of action against the Prepetition Secured Parties.  If any

Committee or non-Debtor party-in-interest, subject to having obtained the requisite standing,

determines that there may be a challenge to the Prepetition Secured Parties by the Investigation

Termination Date, then upon three (3) days' written notice to the Debtors and the Prepetition

Secured Parties, such Committee or other non-Debtor party-in-interest hereafter vested with

authority by this Court shall be permitted to file and prosecute an objection or claim related thereto

(each, a "Challenge"), and shall have only until the applicable Investigation Termination Date to file

such objection or otherwise initiate an appropriate action on behalf of the Debtors' estates setting

forth the basis of any such challenge, claim or cause of action; provided, however, that nothing

contained in the DIP Loan Documents or this Interim Order shall be deemed to confer standing on

any Committee or any other party in interest to commence a Challenge.  If a Challenge is not filed

on or before the Investigation Termination Date, then, without further action by any party or any

further order of this Court: (a) the agreements, acknowledgements and stipulations contained in

Paragraph D of this Interim Order, shall be deemed to be immediately and irrevocably binding on

the Debtors and the Debtors' estates, the Committee and all parties-in-interest and any and all

successors-in-interest as to any of the foregoing, and any Committee and any other party-in-interest

and any and all successors-in-interest thereto, shall thereafter be forever barred from bringing any

Challenge; (b) the liens and security interests of the Prepetition Secured Parties shall be deemed to

constitute valid, binding, enforceable and perfected liens and security interests not subject to

avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(c) the Prepetition Obligations shall be deemed to be finally allowed claims for all purposes in these

Chapter 11 Cases and any subsequent chapter 7 cases, in the amounts set forth in Paragraph D and

shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and

(d) the Debtors shall be deemed to have released, waived and discharged each of the Prepetition

Secured Parties (whether in their prepetition or postpetition capacity), together with their respective

officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or

successors, from any and all claims and causes of action arising out of, based upon or related to, in

whole or in part, the Prepetition Obligations or their prepetition relationship with such Debtor or any

affiliate thereof relating to any of the Prepetition Loan Documents or any transaction contemplated

thereby, including, without limitation, any claims or defenses as to the extent, validity, priority, or

enforceability of the Prepetition First Priority Liens or the Prepetition Obligations, any claims or

defenses under chapter 5 of the Bankruptcy Code or any other causes of action.  Notwithstanding

anything to the contrary herein: (a) if any such Challenge is timely commenced, the stipulations

contained in Paragraph D of this Interim Order shall nonetheless remain binding on all parties-in-

interest and preclusive except to the extent that such stipulations are expressly and successfully

challenged in such Challenge; and (b) the Prepetition Secured Parties reserve all of their rights to

contest on any grounds any Challenge.

15.    **Protection of DIP Lender's Rights**.  So long as there are any DIP Loans or other

amounts outstanding under the DIP Credit Agreement or any other DIP Obligations are outstanding,

the Prepetition Secured Parties (i) shall not take any action to foreclose upon or recover in

connection with their respective liens and security interests, other agreements, or operation of law of

this Interim Order, or otherwise exercise remedies against any DIP Collateral, except to the extent

authorized herein or by any other order of this Court, (ii) shall be deemed to have consented to any

release of DIP Collateral authorized under the DIP Loan Documents, (iii) shall not file any further

financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or

similar instruments, enter into any control agreement, or otherwise take any action to perfect their

security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Lender files

financing statements or other documents to perfect the liens granted pursuant to this Interim Order,

or as may be required by applicable state law to continue the perfection of valid and unavoidable

liens or security interests as of the Petition Date, and (iv) shall not seek to terminate or modify the

use of Cash Collateral.

16.    **Dispositions of Collateral**.  In the event of any sale, lease or other disposition of any

DIP Collateral (a "Collateral Disposition"), the Debtors shall, as a condition to approval of such

Collateral Disposition, to the extent required by the DIP Credit Agreement, immediately pay, or

cause to be paid to, the DIP Lender all of the proceeds of such Collateral Disposition for application

to the DIP Obligations and shall comply with all other provisions in the DIP Loan Documents and

this Interim Order in connection with any such Collateral Disposition.  All such proceeds of any Collateral Disposition shall be applied in accordance with the terms and conditions of the DIP Credit Agreement until the DIP Loan and all DIP Obligations and Prepetition Obligations shall have been paid in full.  Any proceeds in excess of the amounts needed to pay such obligations shall be paid to the Debtors.

17.    **Further Assurances**.  The Debtors shall execute and deliver to the DIP Lender, Prepetition Agent and the Prepetition Secured Parties, all such agreements, financing statements, instruments and other documents as the DIP Lender, Prepetition Agent, and Prepetition Secured Parties, may reasonably request to evidence, confirm, validate or evidence the perfection of the DIP Liens or the Adequate Protection Liens granted pursuant hereto.  Further, the Debtors are authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, pledge agreements, control agreements, mortgages and financing statements), and shall pay fees and expenses that may be required or necessary for the Debtors' performance under the DIP Loan Documents, including, without limitation, (i) the execution of the DIP Loan Documents and (ii) the payment of the fees, costs and other expenses described in the DIP Loan Documents as such become due.

18.    **506(c) Waiver**.  Subject to the entry of the Final Order, and except to the extent of the Carve-Out, no costs or expenses of administration of these Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Prepetition Collateral or the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the DIP Lender or the Prepetition Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, the Prepetition Agent or the Prepetition Lenders.  In no event shall the DIP Lender or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

19.    **Restrictions on Granting Post-Petition Liens**.  Other than the Carve-Out, or as

26

otherwise provided in this Interim Order or the DIP Credit Agreement, no claim having a priority

superior or *pari passu* with those granted by this Interim Order to the DIP Lender and the Prepetition

Secured Parties shall be granted or permitted by any order of this Court heretofore or hereafter

entered in these Chapter 11 Cases, while any portion of the DIP Facility (or refinancing thereof), any

DIP Loan, or any other DIP Obligations are outstanding.  Except as expressly permitted by this

Interim Order and the DIP Loan Documents, the Debtors will not, at any time during these Chapter

11 Cases, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to

any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.  Unless all DIP

Obligations shall have indefeasibly been paid in full in cash (or as otherwise provided in this Interim

Order and the DIP Loan Documents), and the Adequate Protection Obligations shall have been

indefeasibly paid full in cash, the Debtors shall not seek, and it shall constitute an Event of Default

(as defined in the DIP Credit Agreement) and terminate the right of the Debtors to use Cash

Collateral under this Interim Order if Debtors seek, or if there is entered, (i) any modification or

extension of this Interim Order without the prior written consent of the DIP Lender (or, to the extent

the DIP Obligations shall have been indefeasibly paid in full in cash (or otherwise fully satisfied as

provided in this Interim Order and the DIP Loan Documents), the Pre-Petition Agent), and no such

consent shall be implied by any other action, inaction or acquiescence, or (ii) an order converting or

dismissing any of these Chapter 11 Cases.

     20.    **Automatic Effectiveness of Liens**.  The DIP Liens and Adequate Protection Liens

shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-

avoidable and effective by operation of law as of the Petition Date, having the priority set forth in

Paragraph 10 of this Interim Order, without any further action by the Debtors, the DIP Lender or the

Prepetition Secured Parties and without the necessity of execution by the Debtors, or the filing or

recordation, of any financing statements, security agreements, vehicle lien applications, mortgages,

filings with the U.S. Patent and Trademark Office, or the Library of Congress, or other documents or

the taking of any other actions.  All DIP Collateral shall be free and clear of other liens, claims and

encumbrances, except as permitted in the DIP Loan Documents and this Interim Order.  If the DIP

Lender or the Prepetition Agent hereafter requests that the Debtors execute and deliver to the DIP

Lender or the Prepetition Agent financing statements, security agreements, collateral assignments,

mortgages, or other instruments and documents considered by such agent to be reasonably necessary

or desirable to further evidence the perfection of the DIP Liens or the Adequate Protection Liens, as

applicable, the Debtors are hereby directed to execute and deliver such financing statements, security

agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Lender and

the Prepetition Agent are hereby authorized to file or record such documents in its discretion without

seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which

event all such documents shall be deemed to have been filed or recorded at the time and on the date

of entry of this Interim Order.

21.    **Automatic Stay**.  As provided herein, subject only to the provisions of the DIP Credit

Agreement and without further order from this Court, the automatic stay provisions of section 362 of

the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to

exercise, upon the occurrence and during the continuance of any Event of Default (as defined in the

DIP Credit Agreement), all rights and remedies provided for in the DIP Loan Documents, and to

take any or all of the following actions: (a) immediately cease making any advances or issuing any

letters of credit under the DIP Facility and to cease authorizing the use thereof; (b) declare all DIP

Obligations to be immediately due and payable; (c) charge the default rate of interest provided for

under the DIP Credit Agreement; and, so long as the DIP Lender has provided five (5) business days

prior written notice to the Debtors, their bankruptcy counsel, counsel to the Committee (if any),

counsel to the respective DIP Lender and Prepetition Secured Parties, and the U.S. Trustee and the

opportunity for the Debtors to cure any identified Event(s) of Default: (d) terminate the Debtors'

authority to use Cash Collateral; (e) freeze monies or balances in the Debtors' accounts; (f)

immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Lender

against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession

of any of the DIP Lender for application towards the DIP Obligations; and (g) take any other actions

or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan

Documents or applicable law to effect the repayment of the DIP Obligations.  Following the giving

of written notice by the DIP Lender of the occurrence of an Event of Default, the Debtors and any

Committee in these Chapter 11 Cases shall be entitled to an emergency hearing before this Court

solely for the purpose of contesting whether an Event of Default has occurred; provided, however,

that the Court may consider these arguments or any other pertinent matters.  Upon entry of this

Interim Order, the Debtors shall not have the right to contest the enforcement of the remedies set

forth in this Interim Order and the DIP Loan Documents on any basis other than an assertion that no

Event of Default has occurred, and, except with respect to such an assertion, no party-in-interest

shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or

otherwise, or to seek any injunctive relief inconsistent with the provisions of this Interim Order or

the DIP Loan Documents.  The rights and remedies of the DIP Lender and DIP Lender specified

herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have

under the DIP Loan Documents or otherwise.  The Debtors shall cooperate fully with the DIP

Lender in their exercise of rights and remedies against the DIP Collateral.  This Court shall retain

exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the

provisions of this paragraph and relating to the application, re-imposition or continuance of the

automatic stay as provided hereunder.

22.    **Additional Event of Default.**  In addition to the Events of Default set forth in the

DIP Credit Agreement, it shall be an Event of Default under the DIP Credit Agreement and this

Interim Order, entitling the DIP Lender to exercise the remedies under the DIP Credit Agreement

and the Interim Order, if, other than as set forth in Section 6 of the DIP Credit Agreement, EOI or

the Guarantors sell any of their assets other than in the ordinary course of business consistent with

past practice, or any of the following fails to occur:

a.    on the Petition Date, the Debtors shall have filed a motion, in form and

substance acceptable to the DIP Lender, under Section 363 of the Bankruptcy

Code (the "Sale Procedures Motion") for authority to market for sale and to

solicit bids for all or substantially all of EEHI's equity interests in EOI, or,

1    subject to certain conditions, all of EOI's operating assets (collectively, the

2    "Assets") in one transaction or a series of transactions to a purchaser or

3    purchasers under purchase agreement(s), subject to the receipt of higher and

4    better bids, which motion shall seek initial indications of interest from bidders

5    on or before May 7, 2013, and which otherwise shall be in form and substance

6    acceptable to the DIP Lender;

7    b.    on or before April 16, 2013, the Debtors shall have retained, and filed an

8    application with the Court for approval of the Debtors' employment of, an

9    outside financial advisor or consultant who is acceptable to the DIP Lender;

10   c.    on or before April 30, 2013, the Debtors shall have obtained Court approval of

11   their employment of Cappello Capital Corp., or another investment bank

12   acceptable to the DIP Lender, as the Debtors' exclusive investment banker to

13   run the marketing and sale process described in the Sale Procedures Motion;

14   d.    on or before May 7, 2013, the Debtors shall have obtained Court approval of

15   the Sale Procedures Motion, pursuant to an order (the "Sale Procedures

16   Order") in form and substance acceptable to the DIP Lender, granting the Sale

17   Procedures Motion, which Sale Procedures Order shall require that any final

18   bid for all or substantially all of the Assets shall be in writing and shall be

19   received by the Debtors or the Debtors' investment banker on or before May

20   23, 2013;

21   e.    on or before June 1, 2013, the Debtors shall have filed (i) a motion seeking

22   Court approval of the overbidding procedures to be utilized in connection with

23   an auction (the "Auction") for the sale of all or substantially all of the Assets

24   (the "Overbidding Procedures Motion"), and (ii) a motion seeking Court

25   approval of the sale of all or substantially all of the Assets, free and clear of

26   all liens and claims, to the bidder who has submitted the highest and best bid

27   for all or substantially all of the Assets (the "Initial Winning Bidder"), or to

28

30

such other bidder who is determined to have submitted the highest and best

bid for all or substantially all of the Assets at the Auction (the "<u>Asset Sale</u>");

f.    on or before June 24, 2013, the Debtors shall have conducted, subject to the

Sale Procedures Order and the order granting the Overbidding Procedures

Motion, the Auction for the sale of all or substantially all of the Assets, free

and clear of all liens and claims;

g.    on or before June 24, 2013, the Debtors shall have obtained an order from the

Court (the "<u>Sale Order</u>"), in form and substance acceptable to the DIP Lender,

approving the Asset Sale to the purchaser submitting the highest and best bid

at the Auction, free and clear of all liens and claims; and

h.    on or before July 8, 2013, the Debtors shall have consummated the Asset Sale.

23.    **<u>Credit Bid</u>.**

a.    The DIP Lender shall have the unqualified right to credit bid up to the full

amount of the outstanding DIP Obligations in any sale of any DIP Collateral

under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of

reorganization or a plan of liquidation under section 1129 of the Bankruptcy

Code, or (iii) a sale or disposition by a chapter 7 trustee for the Debtors under

section 725 of the Bankruptcy Code.

b.    The Prepetition Agent shall have the unqualified right to credit bid up to the

full amount of any Prepetition Obligations in the sale of any Prepetition

Collateral subject to the satisfaction of the DIP Obligations, or as otherwise

consented to by the DIP Lender under or pursuant to (i) section 363 of the

Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under

section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter

7 trustee for any Debtors under section 725 of the Bankruptcy Code.

24.    **<u>Binding Effect</u>**.  The provisions of this Interim Order shall be binding upon and inure

to the benefit of the DIP Lender, the Prepetition Secured Parties, the Debtors, any Committee

31

appointed in these Chapter 11 Cases, and their respective successors and assigns (including any

chapter 7 or chapter 11 trustee hereafter appointed or elected for the estates of the Debtors, an

examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary

appointed as a legal representative of any of the Debtors or with respect to the property of the estates

of any of the Debtors). To the extent permitted by applicable law, this Interim Order shall bind any

trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or

in the event of the conversion of any of these Chapter 11 Cases to a liquidation under chapter 7 of

the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

25.  **Survival**.  The provisions of this Interim Order and any actions taken pursuant hereto

shall survive the entry of any order: (i) confirming any plan of reorganization in these Chapter 11

Cases (and, to the extent not satisfied in full in cash, the DIP Obligations shall not be discharged by

the entry of any such order, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors

having hereby waived such discharge), (ii) converting any of these Chapter 11 Cases to a chapter 7

case, or (iii) dismissing any of these Chapter 11 Cases, and the terms and provisions of this Interim

Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted

pursuant to this Interim Order and the DIP Loan Documents (and with respect to the entry of any

order as set forth in clause (ii) or (iii) of this Paragraph 25, the Adequate Protection Liens and

Prepetition Superpriority Claims) shall continue in full force and effect notwithstanding the entry of

any such order.  Such claims and liens shall maintain their priority as provided by this Interim Order

and the DIP Loan Documents, and to the maximum extent permitted by law, until all of the DIP

Obligations are indefeasibly paid in full and discharged.  In no event shall any plan of reorganization

be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the

DIP Loan Documents.

26.  **Reallocation.**  For the avoidance of doubt, in the event that it is determined by this

Court after a successful Challenge, if any, that the Prepetition Secured Parties did not maintain valid,

perfected and enforceable liens on the Prepetition Collateral, the Court, after notice and hearing,

reserves the right to reallocate any payments made to the Prepetition Secured Parties and modify any

liens and claims granted pursuant to this Interim Order, including the grant of adequate protection to

the Prepetition Secured Parties.

27.    **Insurance Policies**.  Upon entry of this Interim Order, the DIP Lender shall be, and

shall be deemed to be, without any further action or notice, named as additional insureds and loss

payees, as applicable, on each insurance policy maintained by the Debtors which in any way relates

to the DIP Collateral.  The Debtors are authorized and directed to take any actions necessary to have

the DIP Lender be added as an additional insured and loss payee on each insurance policy.

28.    **Restriction on Use of DIP Lender's Funds**.  None of the Debtors shall be permitted

to use the proceeds of the DIP Facility: (a) for the payment of interest and principal with respect to

any indebtedness that is subordinated to the DIP Facility except as expressly set forth herein, (b) to

finance in any way any adversary action, suit, arbitration, proceeding, application, motion, other

litigation, examination or investigation of any type relating to or in connection with the DIP Loan

Documents, including, without limitation, any Challenges to the Prepetition Obligations, or the

validity, perfection, priority, or enforceability of any Prepetition First Priority Lien securing such

claims or any payment made thereunder, (c) to finance in any way any action, suit, arbitration,

proceeding, application, motion, other litigation, examination or investigation of any type adverse to

the interests of the DIP Lender or their rights and remedies under the DIP Credit Agreement, the

other DIP Loan Documents, this Interim Order or the Final Order without the prior written consent

of the DIP Lender, (d) to make any distribution under a plan of reorganization in any Chapter 11

Cases, and (e) to make any payment in settlement of any material claim, action or proceeding, before

any court, arbitrator or other governmental body without the prior written consent of the DIP Lender.

Notwithstanding anything herein to the contrary, for so long as the Debtors are authorized to use the

Prepetition Secured Parties' Cash Collateral with the consent of the Prepetition Secured Parties, no

Cash Collateral of the Prepetition Secured Parties may be used directly or indirectly by any of the

Debtors, any Committee or any other person or entity to object to or contest in any manner the

Prepetition Obligations or Prepetition First Priority Liens, or to assert or prosecute any actions,

claims or causes of action against any of the Prepetition Secured Parties without the consent of the

applicable Prepetition Secured Parties.

29. **Release of Claims and Defenses**. Each of the Debtors and Guarantors hereby releases and discharges each of the DIP Lender together with its respective affiliates, agents, attorneys, officers, directors and employees (collectively, the "Released Parties"), from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of loans under the DIP Facility or the DIP Loan Documents, any aspect of the relationship between the Debtors, on the one hand, and any or all of the Released Parties, on the other hand, relating to any of DIP Loan Documents or any transaction contemplated thereby or any other acts or omissions by any or all of the Released Parties in connection with any of the DIP Loan Documents or their prepetition relationship with such Debtor or any affiliate thereof relating to any of the DIP Loan Documents or any transaction contemplated thereby, including, without limitation, any claims or defenses under chapter 5 of the Bankruptcy Code or any other causes of action (collectively, the "Claims and Defenses").

30. **Protection Under Section 364(e)**. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations or Adequate Protection Obligations owing to the DIP Lender or the Prepetition Secured Parties incurred prior to the actual receipt by the DIP Lender or the Prepetition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations or Adequate Protection Obligations owing to the Prepetition Secured Parties. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or Adequate Protection Obligations owing to the Prepetition Secured Parties, by the Debtors prior to the actual receipt by the DIP Lender or the Prepetition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section

34

364(e) of the Bankruptcy Code, this Interim Order, and the DIP Loan Documents with respect to all

uses of Cash Collateral and the incurrence of DIP Obligations, and Adequate Protection Obligations

owing to the Prepetition Secured Parties.

31.    **Effect of Dismissal of Chapter 11 Cases**.  If any of these Chapter 11 Cases are

dismissed, converted or substantively consolidated, such dismissal, conversion or substantive

consolidation of these Chapter 11 Cases shall not affect the rights of the DIP Lender or the

Prepetition Secured Parties under their respective DIP Loan Documents, Prepetition Loan

Documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP

Lender and Prepetition Secured Parties shall remain in full force and effect as if these Chapter 11

Cases had not been dismissed, converted, or substantively consolidated.  If an order dismissing any

of these Chapter 11 Cases is at any time entered, such order shall provide (in accordance with

Sections 105 and 349 of the Bankruptcy Code) that: (i) the DIP Liens and DIP Superpriority Claims

granted to and conferred upon the DIP Lender and the protections afforded to the DIP Lender

pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect

and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall

have been paid and satisfied in full (and that such DIP Liens, DIP Superpriority Claims and other

protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) those

primed or unprimed (as the case may be) Prepetition First Priority Liens, Adequate Protection Liens

and Prepetition Superpriority Claims granted to and conferred upon the Prepetition Secured Parties,

as applicable, shall continue in full force and effect and shall maintain their priorities as provided in

this Interim Order until all Prepetition Indebtedness shall have been paid and satisfied in full (and

that such Prepetition Superpriority Claims shall, notwithstanding such dismissal, remain binding on

all interested parties); and (iii) to the greatest extent permitted by applicable law, this Court shall

retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens,

Prepetition First Priority Liens, Adequate Protection Liens, DIP Superpriority Claims and

Prepetition Superpriority Claims referred to herein.

32.    **Choice of Law; Jurisdiction**.  The DIP Facility and the DIP Loan Documents (and

the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.  The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or the DIP Loan Documents.

33.    **Authorized Signatories.**  The signature of any Authorized Officer (as defined in the Debtors' corporate resolutions filed with the Petition) or Debtors' attorneys appearing on any one or more of the DIP Loan Documents shall be sufficient to bind the Debtors.  No board of directors or other approval shall be necessary.

34.    **Order Effective**.  This Interim Order shall be effective as of the date of the signature by the Court.

35.    **No Requirement to Accept Title to Collateral**. Neither the DIP Lender nor the Prepetition Secured Parties shall be obligated to accept title to any portion of the Prepetition Collateral or DIP Collateral in payment of the indebtedness owed to such party by the Debtors, in lieu of payment in cash or cash equivalents, nor shall any of the DIP Lender nor Prepetition Secured Parties be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity other than the DIP Lender.

36.    **Controlling Effect of Interim Order**.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion, any prepetition agreement or any DIP Loan Document, the provisions of this Interim Order shall control.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

36

37.    **Final Hearing**.  A final hearing on the Motion shall be heard before this Court on

_____, 2013 at _____.m. at the United States Court, 411 West Fourth Street, Santa

Ana, CA 92701, Courtroom ____.  Any objections shall be filed with the Court on or before

_____, 2013 at 5:00 p.m. (PST), and served upon counsel for the Debtors and the

Prepetition Secured Parties.

###

# EXHIBIT "A"

[DIP Credit Agreement]

## DIP LOAN AGREEMENT

This **DIP LOAN AGREEMENT** (this "Agreement"), dated as April 9, 2013, is entered into by and among Evergreen Oil, Inc., a California corporation, as a debtor-in-possession ("Evergreen Oil" or "Borrower"), Evergreen Environmental Holdings, Inc., a Nevada corporation, as a debtor-in-possession ("Evergreen Environmental Holdings"), Evergreen Holdings, Inc., a Delaware corporation ("Evergreen Holdings"), and Guggenheim Private Debt Fund Note Issuer, LLC ("Lender").

## W I T N E S S E T H:

**WHEREAS**, on April 9, 2013 (the "Petition Date"), Borrower and Evergreen Environmental Holdings commenced Chapter 11 Case Nos. 8:13-bk-13163-SC and 8:13-bk-13168-SC (the "Chapter 11 Cases") by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"). Borrower and Evergreen Environmental Holdings continue to operate their businesses and manage their property as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

**WHEREAS**, Borrower has requested that Lender provide a multiple draw term loan credit facility to Borrower to fund the working capital and general corporate requirements, including certain costs of administration of the Chapter 11 Cases, of Borrower during the pendency of the Chapter 11 Cases in accordance with the Approved Budget (as defined below);

**WHEREAS,** Lender shall from time to time, upon the request of Borrower, make loans to Borrower hereunder in an aggregate amount not to exceed the Maximum Amount (as defined below); and

**WHEREAS**, Borrower has agreed to provide Lender superpriority administrative expense claims against Borrower for their obligations to Lender under this Agreement and the Financing Orders with priority over any and all administrative expenses and all other claims against Borrower, subject to the "Carve-Out" defined in and referred to in the Financing Orders.

**NOW, THEREFORE,** in consideration of the foregoing recitals, and of the mutual covenants, conditions and provisions hereinafter set forth, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby agree as follows:

1.    Definitions.    As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Business Day" means any day other than a Saturday, Sunday or a public or bank holiday or the equivalent for banks generally under the laws of New York.

"DIP Facility Commitment" means $6,000,000.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender (including such additional provisions not present in the Interim Order as Lender shall require), and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur and guaranty debt, and provide for the super priority of Lender's claim under this Agreement.

"Financing Order" means the Interim Order or the Final Order, whichever is in effect at the time of any determination hereunder, and "Financing Orders" means the Interim Order and the Final Order, collectively.

"Governmental Authority" means any nation or government, any state, city, province or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantor" is defined in Section 11.

"Interest Rate" means, as of any date of determination, a per annum rate equal to 10%.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases on [**DATE**] (Docket No. [__]), after an interim hearing (assuming satisfaction of the standards prescribed in Sections 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever.

"Maturity Date" means the earliest of (a) the 120th day to occur after the date hereof (the "Scheduled Maturity Date"), (b) the date of acceleration of the Obligations of Borrower hereunder pursuant to Section 7 and (c) the date of the closing of a sale of all or substantially all of Borrower's or Evergreen Environmental Holdings' Assets pursuant to Section 363 of the Bankruptcy Code or confirmation of a plan of reorganization with respect to the foregoing, in each case in compliance with Section 6 hereof.

"Maximum Amount" means, as of any date of determination, an amount equal to the DIP Facility Commitment as of that date (giving effect to all previous reductions thereof).

2

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans and all other expenses, reimbursements, indemnities and other obligations of Borrower and Guarantors to Lender hereunder and under the Financing Orders.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or Governmental Authority.

2.    Multiple Draw Term Loan Facility.

(a)    Loans.  Lender shall, upon request of Borrower in accordance with Section 2(b), make term loans (each a "Loan" and collectively, the "Loans") to Borrower from time to time prior to the Maturity Date; provided, that after giving effect to any such Loan, the available amount of the DIP Facility Commitment shall be reduced by the aggregate principal amount of the Loans so made.  Each Loan shall be in a minimum amount of $2,000,000 (and minimum increments of $100,000 in excess thereof), and no more than three Loans shall be made hereunder.  No Loan may be reborrowed once repaid and the DIP Facility Commitment shall be permanently reduced by the initial principal amount of each Loan made hereunder. No Loans shall be made (i) if an Event of Default is then outstanding or would result therefrom, (ii) if the proceeds thereof would be used in contravention of the Financing Orders or the Approved Budget or (iii) if no Loans are outstanding and Borrower and Guarantors have at least $2,000,000 of cash on hand.

(b)    Borrowing Requests.  Borrower may from time to time request a Loan under Section 2(a) by providing Lender with a borrowing request in writing or by telephone (or as otherwise agreed between Borrower and Lender) specifying (i) the amount of the requested Loan and (ii) the requested date thereof, which shall be a Business Day. Each borrowing request shall be delivered to Lender at least three Business Days prior to the date on which such Loan has been requested to be made. Lender will make such Loan to Borrower by wire transfer in accordance with the instructions provided by Borrower (or as otherwise agreed between Borrower and Lender).

(c)    Interest.

(i)    Each Loan evidenced by this Agreement shall bear interest from the respective date of borrowing until the date of repayment by maturity, acceleration or otherwise.  Interest shall accrue on the principal balance of each Loan from time to time outstanding hereunder at the Interest Rate (calculated on the basis of a 360-day year for actual days elapsed).

(ii)    Interest on the Loans shall be paid in cash in arrears on the last Business Day of each calendar month.  In addition, on any partial or complete payment or prepayment of principal of the Loans, Borrower shall pay in cash the accrued and unpaid interest on any portion of the Loans so paid or prepaid.

(iii)    Upon the occurrence and during the continuance of an Event of Default, (x) the outstanding principal amount of the Loans (and any overdue interest) shall bear interest at the Interest Rate plus 2.00% per annum, computed

3

and payable as provided above and (y) Lender may require the payment in cash of accrued interest on demand or at regular intervals more frequent than monthly.

    (iv)    In no event shall the interest rate under this <u>paragraph (c)</u> exceed the maximum rate permitted under applicable law.

3.    <u>Payment</u>.

(a)    <u>Payment at Maturity</u>.  All Loans shall be repaid in cash by Borrower on the Maturity Date together with any accrued and unpaid interest on the principal being repaid on the Maturity Date.

(b)    <u>Voluntary Prepayments</u>.  Borrower may, from time to time, without notice to Lender, prepay all or any portion of the Loans without premium or penalty of any type.

(c)    <u>Mandatory Prepayments</u>.  If the average daily amount of cash of Borrower, Evergreen Environmental Holdings and their subsidiaries shall exceed $2,000,000 in the aggregate for any three Business Day period, Borrower shall notify Lender thereof and shall immediately make a prepayment of the Loans and the other Obligations, at the end of such three Business Day period in an aggregate amount equal to such excess. Such cash shall include, without limitation, insurance proceeds and other extraordinary receipts.  All net cash proceeds from an asset sale shall be applied to repay the Obligations.  Once fully paid, all remaining net cash proceeds shall be applied to repay Prepetition Obligations as defined in the Financing Orders.  All such payments shall be made immediately upon receipt of such net cash proceeds and shall be applied pursuant to <u>Section 3(d)</u>.

(d)    <u>Method of Payment</u>.  All payments hereunder, including without limitation all payments of principal of and interest on the Loans, shall be made to Lender at its address referred to in <u>Section 10(a)</u> (or as otherwise agreed between Borrower and Lender) in immediately available funds.  Whenever any payment hereunder becomes due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the interest due.  Any payment made to Lender shall be applied in the following order: first, to the payment of costs and expenses of Lender payable or reimbursable by the Borrower; second, to payment of attorney costs and expenses of Lender payable or reimbursable by the Borrower; third, to payment of all accrued and unpaid interest on the Loans; fourth, to the payment of the principal amount of the Loans outstanding; fifth, to any other amounts owing to Lender hereunder; and sixth, to the payment of all Prepetition Obligations as defined in the Financing Orders.  All payment in respect of the Loans shall be made ratably across all Loans.

4.    <u>Conditions to Effectiveness.</u>  This Agreement shall become effective as of the date first above written upon satisfaction of each of the following (unless otherwise waived by Lender):

(a)    <u>Agreement</u>.  This Agreement or counterparts hereof shall have been duly executed by, and delivered to, Borrower, Guarantors and Lender.

(b)    Approvals.  Lender shall have received satisfactory evidence that Borrower and Guarantors have obtained all required consents and approvals of all Persons, including all requisite Governmental Authorities, to the execution, delivery and performance of this Agreement.

(c)    Interim Order.  The Interim Order in form and substance satisfactory to Lender shall have been entered by the Bankruptcy Court.

(d)    Initial Approved Budget.    Lender shall have received a cash forecast for Borrower and Evergreen Environmental Holdings for the period commencing on the Petition Date and ending on the Scheduled Maturity Date, setting forth projected cash receipts and cash disbursements (by line item) on a monthly basis for such period, to be in form, scope and substance acceptable to Lender (the "Initial Approved Budget").

5.    Approved Budget; Reporting; Use of Proceeds.

(a)    No later than three Business Days after the end of each calendar week (with a calendar week ending on Sunday for purposes of this Agreement, and with the first reporting period for Sections 5(a), (b) and (c) beginning on the date hereof and ending on April 21, 2013), Borrower shall provide Lender with a report in reasonable detail setting forth revenue, operating expenses, cash disbursements, and capital expenditures for such week, as well as cash balances for the Borrower, Evergreen Environmental Holdings and their subsidiaries for such week, together, where applicable, with a comparison to the Approved Budget for such calendar week, all in form and substance acceptable to Lender, and all certified by Borrower as true, accurate and complete.

(b)    No later than three Business Days after the end of each calendar week (subject to the initial reporting period described in Section 5(a)), Borrower shall provide Lender with a report in reasonable detail setting forth collections on accounts receivable and other cash receipts for such week (with a comparison to the Approved Budget, as applicable), all in form and substance acceptable to Lender, and all certified by Borrower as true, accurate and complete.

(c)    No later than eight Business Days after the end of each calendar week (subject to the initial reporting period described in Section 5(a)), Borrower shall provide Lender with a report in reasonable detail setting forth Borrower's, Evergreen Environmental Holdings', and their subsidiaries' used oil collection volumes and procurement costs ($/gallon), throughput volumes, finished product volumes, finished product sales ($/gallon), finished product sales by customer, and inventory levels of used oil and finished product for such week, all in form and substance acceptable to Lender, and all certified by Borrower as true, accurate and complete.

(d)    No later than ten Business Days after the end of each calendar month, Borrower shall provide Lender, in reasonable detail, with balance sheets and statements of income for such calendar month, all in form and substance acceptable to Lender, and all certified by Borrower as true, accurate and complete.

(e)    Not later than ten Business Days after the end of each calendar month, Borrower and Evergreen Environmental Holdings shall provide to Lender an updated cash forecast for Borrower for the period beginning on the first day of the immediately succeeding month and

5

ending on the Scheduled Maturity Date, setting forth projected cash receipts and cash disbursements (by line item) for such period, to be in form, scope and substance acceptable to Lender (the "Monthly Budget Updates").

(f)     The Initial Approved Budget and Monthly Budget Updates may be updated at any time with the written consent of Lender (any such approved update, a "Supplemental Approved Budget"; the Initial Approved Budget, the Monthly Budget Updates and any Supplemental Approved Budgets, collectively, shall constitute the "Approved Budget").

(g)     Commencing with the calendar week ending April 21, 2013, Borrower shall not permit, as of the end of any calendar week, either (i) the aggregate cash receipts of Borrower, Evergreen Environmental Holdings and their subsidiaries for the period from April 15, 2013 through the end of such calendar week to be less than 85% of the aggregate cash receipts of Borrower, Evergreen Environmental Holdings and their subsidiaries set forth in the Approved Budget for such period or (ii) the aggregate operating cash disbursements of Borrower, Evergreen Environmental Holdings and their subsidiaries for the period from April 15, 2013 through the end of such calendar week to be greater than 115% of the aggregate operating cash disbursements of Borrower, Evergreen Environmental Holdings and their subsidiaries set forth in the Approved Budget for such period.

(h)     Promptly after the request therefor from Lender, Borrower and Guarantors shall provide Lender with all other financial information reasonably requested by Lender.

(i)     Borrower shall use proceeds of the Loans in accordance with the Approved Budget and the Financing Order.

6.      Sale Process; Financial Advisor/Consultant.

(a)     Borrower and Evergreen Environmental Holdings, on the Petition Date, shall file a motion, in form and substance acceptable to Lender, under Section 363 of the Bankruptcy Code (the "Sale Procedures Motion") for authority to market for sale and to solicit bids for all or substantially all of Evergreen Environmental Holdings' equity interests in Borrower, or, subject to certain conditions, all of Borrower's operating assets (collectively, the "Assets"), in one transaction or a series of transactions to a purchaser or purchasers under purchase agreement(s), subject to the receipt of higher and better bids, which motion shall seek initial indications of interest from bidders on or before May 7, 2013, and which otherwise shall be in form and substance acceptable to Lender.

(b)     On or before April 16, 2013, Borrower and Evergreen Environmental Holdings shall retain, and file an application with the Bankruptcy Court for approval of their employment of, an outside financial advisor or consultant who is acceptable to Lender (the "Approved Financial Advisor").

(c)     On or before April 30, 2013, the Borrower and Evergreen Environmental Holdings shall obtain Bankruptcy Court approval of their employment of Cappello Capital Corp., or another investment banker acceptable to Lender, as their exclusive investment banker to run the marketing and sale process described in this Section 6.

6

(d)      On or before May 7, 2013, Borrower and Evergreen Environmental Holdings shall receive Bankruptcy Court approval of the Sale Procedures Motion, pursuant to an order (the "Sale Procedures Order") in form and substance acceptable to Lender, granting the Sale Procedures Motion, which Sale Procedures Order shall require that any final bid for all or substantially all of the Assets shall be in writing and shall be received by Borrower and Evergreen Environmental Holdings or the investment banker for the foregoing on or before May 23, 2013.

(e)      On or before June 1, 2013, the Borrower and Evergreen Environmental Holdings shall file (i) a motion seeking Bankruptcy Court approval of the overbidding procedures to be utilized in connection with an auction (the "Auction") for the sale of all or substantially all of the Assets (the "Overbidding Procedures Motion"), and (ii) a motion seeking Court approval of the sale of all or substantially all of the Assets, free and clear of all liens and claims, to the bidder who has submitted the highest and best bid for the Assets (the "Initial Winning Bidder") or to such other bidder who is determined to have submitted the highest and best bid for all or substantially all of the Assets at the Auction (the "Asset Sale").

(f)      On or before June 24, 2013, the Borrower and Evergreen Environmental Holdings shall have conducted, subject to the Sale Procedures Order and the order granting the Overbidding Procedures Motion, the Auction for the sale of all or substantially all of the Assets, free and clear of all liens and claims.

(g)      On or before June 24, 2013, the Borrower and Evergreen Environmental Holdings shall obtain an order from the Bankruptcy Court (the "Sale Order"), in form and substance acceptable to Lender, approving the Asset Sale to the purchaser submitting the highest and best bid at the Auction, free and clear of all liens and claims.

(h)      On or before July 8, 2013, the Borrower and Evergreen Environmental Holdings shall have consummated the Asset Sale.

(i)      Other than in accordance with this Section 6, Borrower and Guarantors shall not sell any of their assets other than in the ordinary course of business consistent with past practice.

7.    <u>Events of Default</u>.  Each of the following events shall be referred to herein as an "<u>Event of Default</u>":

(a)    failure to make any payment of any installment of principal of or interest upon any Loan when due and payable;

(b)    failure of Borrower or any Guarantor to comply with Section 5 or Section 6;

(c)    Borrower or Evergreen Environmental Holdings terminates the Approved Financial Advisor, or the Approved Financial Advisor resigns and, upon such resignation, a replacement therefor acceptable to Lender does not assume the duties and obligations of Approved Financial Advisor within 14 days after such resignation;

(d)    The investment banker retained to run the sale process as discussed in <u>Section </u>6 is terminated or resigns from its engagement;

(e)    failure of Borrower or any Guarantor to perform or observe any other term, covenant or agreement contained in this Agreement and such default shall continue unremedied for a period of five (5) Business Days;

(f)    Other than a sale of all or substantially all of the Assets of Borrower and Evergreen Environmental Holdings in accordance with <u>Section 6</u> hereof, Borrower or any Guarantor shall sell any asset (including equity interests in any entity) outside of the ordinary course of business or in a manner that is inconsistent with past practice;

(g)    Lender, Borrower or any Guarantor shall have failed to receive, as and when required, any consent or approval from any Governmental Authority necessary in order for such party to perform its obligations hereunder in accordance with all applicable laws, rules and regulations; or

(h)    the occurrence of any of the following in any Chapter 11 Case:

(i)    the entry of, or Borrower or Evergreen Environmental Holdings shall seek, an order amending, supplementing, staying, vacating or otherwise modifying this Agreement or the Interim Order or the Final Order without the written consent of Lender (other than the replacement of the Interim Order with the Final Order);

(ii)    the appointment of an interim or permanent trustee or the appointment of a responsible person or an examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization Borrower or Evergreen Environmental Holdings;

(iii)    the dismissal of any Chapter 11 Case or conversion from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code;

(iv)    the entry of an order avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

8

(v)    the entry of an order granting any other superpriority administrative claim or Lien equal or superior to that provided to Lender; or

(vi)    the Financing Order ceases to be in full force and effect.

8.    Remedies.

(a)    Certain Action Following a Default.  If any Event of Default shall occur and be continuing, upon compliance with the terms and conditions of the Financing Order, then Lender may, in its sole discretion (i) by notice in writing to Borrower, (A) declare its commitment to make additional Loans hereunder to be terminated and (B) declare all or any part of the unpaid balance of the Loans then outstanding to be immediately due and payable and (ii) exercise any rights and remedies provided to Lender under this Agreement, under the Financing Order or at law or equity.

(b)    Cumulative Remedies.  To the extent not prohibited by applicable law which cannot be waived, all of Lender's rights hereunder and under any other document between Lender, Borrower and Guarantors shall be cumulative.  No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

(c)    Waivers.  To the extent that such waiver is not prohibited by the provisions of applicable law that cannot be waived, each of Borrower and each Guarantor hereby waives (1) all presentments, demands for performance, notices of nonperformance (except to the extent required by this Agreement), protests, notices of protest and notices of dishonor; (2) any requirement of diligence or promptness on the part of Lender in the enforcement of its rights under this Agreement; (3) any and all notices of every kind and description which may be required to be given by any statute or rule of law; and (4) any defense (other than indefeasible payment in full) which it may now or hereafter have with respect to its liability under this Agreement.

9.    Indemnification; Expenses.  Borrower and Guarantors agree, jointly and severally, to indemnify, defend, and hold and save harmless Lender and its employees, agents, attorneys, advisors, directors, members, management, officers or other affiliates (collectively, "Indemnitees") from any losses, damages, claims, actions, demands, or lawsuits of any kind whatsoever (including reasonable attorneys' fees) arising in any way directly or indirectly out of the transactions contemplated by this Agreement, except such as may be caused by the gross negligence or willful misconduct of the applicable Indemnitee.  Borrower and Guarantors agree jointly and severally (a) to pay or reimburse Lender for its reasonable out-of-pocket costs and expenses incurred in connection with the preparation and execution of, and any amendment, supplement or modification to, this Agreement and any documents prepared in connection herewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable out-of-pocket fees and disbursements and other charges of counsel to Lender and advisors to Lender, and (b) to pay or reimburse Lender for all of its reasonable out-of-pocket costs and expenses incurred in connection with the

enforcement or preservation of any rights under this Agreement and any other documents prepared in connection herewith, including, without limitation, the reasonable out-of-pocket fees and disbursements of counsel to Lender and advisors to Lender.  This <u>Section 9</u> shall survive termination of this Agreement.

      10.    <u>Miscellaneous</u>.

      (a)    <u>Notices</u>.  Any communication, notice or demand required or permitted to be given hereunder shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier at the address or telecopier number set forth in <u>Schedule I</u> hereto.  Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Guarantors agree that any notice delivered to Borrower shall be deemed to have been concurrently delivered to Guarantors.

      (b)    <u>Entire Agreement; Severability</u>.  This Agreement sets forth the parties' entire agreement and understanding in respect of the subject matter contained herein.  Notwithstanding the foregoing, however, the Financing Order shall continue to govern the terms and conditions of the transactions contemplated hereby to the extent inconsistent with, or address matters not addressed in, this Agreement.  If any term or provision hereof, or its application to any person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such terms to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby and each term hereof shall be valid and enforceable to the fullest extent permitted by applicable law.

      (c)    <u>Assignment</u>.  Neither this Agreement nor any of the rights, interests or obligations of Borrower or any Guarantor hereunder shall be assigned or otherwise transferred by Borrower or any Guarantor, nor may Borrower or any Guarantor delegate performance hereunder, except with Lender's prior written consent.

      (d)    <u>Amendments; Waivers</u>.  All amendments, supplements or other modifications hereof must be made by written agreement of the parties hereto.

      (e)    <u>APPLICABLE LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN LENDER AND BORROWER OR ANY GUARANTOR PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; <u>PROVIDED</u>, THAT LENDER, BORROWER AND GUARANTORS ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT;

10

PROVIDED FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON ANY COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER.

(f)      WAIVER OF VENUE.  EACH OF BORROWER AND EACH GUARANTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN SECTION 10(e).  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(g)      SERVICE OF PROCESS.   EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10(a).  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

(h)      WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

(i)      Counterparts.  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  A facsimile copy of a signature hereto shall have the same effect as the original of such signature.

(j)      Reinstatement.  In the event that any payment hereunder, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(k)      Binding Agreement.  This Agreement shall be binding upon Borrower, Evergreen Environmental Holdings, the estate of each of the foregoing, and any trustee or successor in interest of Borrower or Evergreen Environmental Holdings in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.  This Agreement shall be binding upon, and inure to the benefit of, the successors of Lender and its assigns, transferees and endorsers.  The superpriority claims and any Liens that may be created by this Agreement and the Financing Orders shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of Borrower or

11

Evergreen Environmental Holdings to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect any security interests or Liens under applicable law.  As of the date hereof and on each date on which a Loan is made, each of the Borrower and each Guarantor represents and warrants as follows: (i) it is duly organized, valid existing and in good standing under the laws of its jurisdiction of organization; (ii) it has the power and authority to enter into this Agreement and perform its duties and obligations under and in connection herewith; (iii) it is in compliance in all material respects with all applicable laws and regulations, and the execution, delivery and performance hereof does not conflict with any material law, regulation or agreement in any material respect; (iv) this Agreement and the agreements, documents and instruments delivered in connection herewith have been duly executed and delivered by it, and this Agreement constitutes its legal, valid and binding obligation and is enforceable against it (subject to limitations imposed by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law)).

     11.   <u>Guaranty</u>.

     (a)   <u>Guaranty</u>.  Each of Evergreen Environmental Holdings and Evergreen Holdings (each a "<u>Guarantor</u>" and collectively the "<u>Guarantors</u>") hereby absolutely and unconditionally guarantees to Lender and its successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Obligations owed or hereafter owing to Lender by Borrower or any other Guarantor.  Each Guarantor agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this <u>Section 11</u> shall not be discharged until payment and performance, in full, of the Obligations has occurred and this Agreement has terminated, and that its obligations under this <u>Section 11</u> shall be absolute and unconditional.  Each Guarantor shall be regarded, and shall be in the same position, as principal debtor with respect to the Obligations guaranteed hereunder.

     (b)   <u>Benefit of Guaranty</u>.  Each Guarantor agrees that the provisions of this <u>Section 11</u> are for the benefit of Lender and its successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Guarantor and Lender, the obligations of such other Guarantor under this Agreement.

     (c)   <u>Waiver of Subrogation, Etc</u>.  Notwithstanding anything to the contrary in this Agreement, each Guarantor hereby expressly and irrevocably waives any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor.  Each Guarantor acknowledges and agrees that this waiver is intended to benefit Lender and shall not limit or otherwise affect such Guarantor liability hereunder or the enforceability of this <u>Section 11</u>, and that Lender and its successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this <u>Section 11(c)</u>.

     12.   <u>Grant of Collateral</u>.  To secure its obligations hereunder (including all obligations and guaranty obligations), each of Borrower and each Guarantor hereby grants to Lender a lien

upon and security interest in all of such Borrower's or such Guarantor's right, title and interest in and to all of its personal property and other assets, including, without limitation, all of its accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, oil, gas, patents, trademarks, copyrights, other intellectual property, equity interests (including equity interests of its subsidiaries), and general intangibles, together with all additions thereto, substitutions therefor and proceeds and products thereof. Each of Borrower and each Guarantor shall take all actions requested by Lender to perfect Lender's liens and security interests in the foregoing, and each of Borrower and each Guarantor authorizes Lender to take all such actions (including filing financing statements) necessary to perfect Lender's liens and security interests in the foregoing. Upon the occurrence of an Event of Default, Lender may exercise any and all rights and remedies available under law or contract in respect of the foregoing personal property and assets, including, without limitation, those rights and remedies provided to the secured party in the agreements, documents and instruments evidencing the Prepetition Obligations, which rights and remedies are incorporated herein by reference, and including Lender's right to vote all equity interests pledged to it. Each of Borrower and each Guarantor appoints Lender as its attorney-in-fact (with such appointment coupled with an interest) to take actions that Lender deems necessary or advisable to accomplish the purposes of this Agreement.

The remainder of this page is intentionally blank.

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be duly executed as of the date first above written.

<u>**LENDER**</u>

GUGGENHEIM PRIVATE DEBT FUND NOTE ISSUER, LLC

By: Guggenheim Partners Investment Management, LLC, as Manager


By: _____
Name:
Title:

## BORROWER

EVERGREEN OIL, INC.


By: _____
Name:
Title:

## GUARANTORS

EVERGREEN ENVIRONMENTAL HOLDINGS, INC.


By: _____
Name:
Title:


EVERGREEN HOLDINGS, INC.


By: _____
Name:
Title:

SCHEDULE I

Notice Information

Borrower and Guarantors

Evergreen Oil, Inc.
Evergreen Environmental Holdings, Inc.
Evergreen Holdings, Inc.
Address:  2415 Campus Drive, Suite 225, Irvine, CA 92612
Attention: William Scottini
Telephone: (949) 757-7770
Facsimile: (949) 757-7751

-with a copy to-

Levene, Neale, Bender, Yoo & Brill L.L.P.
Address:  10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067
Attention:  David L. Neale, Esq.
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

Lender

Guggenheim Private Debt Fund Note Issuer, LLC
Address:  135 East 57th Street, New York, NY  10022
Attention:  Kaitlin Trinh
Telephone:  212-644-8107
Facsimile:   212-644-8107

With a copy to:

Andrew Kenney
100 Wilshire Blvd., Suite 500
Santa Monica, CA  90401
Telephone:  310-576-1250

# EXHIBIT "B"

[Initial Approved Budget]

4/9/2013

Evergreen OVERALL Cash Flow Budget Version 7.xls - Detailed Consolidation

| | NOTES | WE Apr12 Forecast Total | WE Apr19 Forecast Total | WE Apr26 Forecast Total | WE May3 Forecast Total | WE May10 Forecast Total | WE May17 Forecast Total | WE May24 Forecast Total | WE May31 Forecast Total | WE Jun7 Forecast Total | WE Jun14 Forecast Total | WE Jun21 Forecast Total | WE Jun28 Forecast Total | WE Jul5 Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Cash Receipts** | | | | | | | | | | | | | | |
| Services | | 252,406 | 250,656 | 253,734 | 256,846 | 254,720 | 253,673 | 253,926 | 254,580 | 254,749 | 254,329 | 254,251 | 254,367 | 254,455 |
| Products | d | 926,162 | 378,025 | 402,553 | 653,982 | 1,268,123 | 1,268,123 | 1,268,123 | 1,268,123 | 1,268,123 | 1,268,123 | 1,268,123 | 1,268,123 | 1,268,123 |
| Interest & Misc. Income | | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 |
| | | **1,178,580** | **628,693** | **656,300** | **910,840** | **1,522,855** | **1,521,808** | **1,522,061** | **1,522,715** | **1,522,884** | **1,522,465** | **1,522,386** | **1,522,502** | **1,522,590** |
| **Cost of Sales** | | | | | | | | | | | | | | |
| Waste Disposal Costs | | 138,001 | 232,646 | 138,001 | 232,646 | 138,001 | 232,646 | 138,001 | 232,646 | 138,001 | 232,646 | 138,001 | 232,646 | 138,001 |
| New Filter Drums | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Used Oil Purchases | c | 201,200 | 815,150 | 815,150 | 665,150 | 715,150 | 665,150 | 715,150 | 665,150 | 715,150 | 665,150 | 715,150 | 665,150 | 715,150 |
| Glycol and Tank Purchases | | 25,000 | 29,138 | 25,000 | 25,000 | 25,000 | 29,138 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Parts Washer Purchases | | - | - | 213 | 5,000 | - | - | 213 | 5,000 | - | 5,000 | - | 5,000 | - |
| Transportation Costs | | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 |
| Lab Analysis & Supplies | | - | 1,105 | - | 827 | - | 1,105 | - | 827 | - | 827 | - | 827 | - |
| CI Testing Kits | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rail Car Rental | | 53,570 | - | 53,570 | - | 53,570 | - | 53,570 | - | 53,570 | - | 53,570 | - | 53,570 |
| Truck Freight | | - | - | 8,536 | - | - | - | - | 8,536 | - | 8,536 | - | 8,536 | - |
| Rail Freight | | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - | 30,000 | - |
| Hydrogen/Nitrogen | | - | - | - | - | 92,000 | - | - | - | 92,000 | - | - | - | - |
| Catalyst (Shutdown Costs) | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Caustic | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Purate | | - | - | - | 35,000 | - | - | - | - | 35,000 | - | 35,000 | - | 35,000 |
| Electricity | | - | 918 | - | - | 80,000 | 918 | - | - | 80,000 | - | - | - | - |
| Water/Carbon Water | | - | - | - | 14,000 | - | - | - | - | - | - | - | - | - |
| Natural Gas | | - | - | 80,000 | - | - | - | 80,000 | - | - | 80,000 | - | - | - |
| Other Chemicals | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Mfg Supplies | | 6,740 | 889 | 50,000 | 889 | 6,740 | 889 | 50,000 | 889 | 6,740 | 889 | 50,000 | 889 | 20,000 |
| SubContractors | | 6,433 | - | 6,433 | - | - | - | 6,433 | - | 6,433 | - | - | - | 6,433 |
| Rail Car Cleaning | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Uniforms & Safety | | 50 | 1,499 | 65 | 2,317 | 50 | 1,499 | 65 | 2,317 | 50 | 2,317 | 50 | 2,317 | 50 |
| Equipment Rental & Maint | | 1,710 | 2,520 | 21,710 | 15,475 | 1,710 | 2,520 | 1,710 | 35,475 | 1,710 | 15,475 | 1,710 | 35,475 | 1,710 |
| Contractors | i | 30,168 | 162,221 | 30,125 | 367,622 | 30,168 | 32,221 | 30,125 | 37,622 | 30,168 | 37,622 | 30,168 | 37,622 | 30,168 |
| Facility Maintenance | | 40,000 | 40,000 | 30,104 | 30,000 | 30,000 | 30,000 | 25,104 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 |
| Other Cost of Sales | | - | 22,482 | 433 | 28,688 | - | 22,482 | 433 | 28,688 | - | 28,688 | - | 28,688 | - |
| **Cost of Sales** | | **522,872** | **1,358,568** | **1,279,340** | **1,472,614** | **1,198,822** | **1,068,568** | **1,145,804** | **1,117,150** | **1,228,822** | **1,097,150** | **1,180,082** | **1,117,150** | **1,070,082** |
| % Cost of Sales - Cash Basis | | 44% | 216% | 195% | 162% | 79% | 70% | 75% | 73% | 81% | 72% | 78% | 73% | 70% |
| **Transportation Expenses** | | | | | | | | | | | | | | |
| Vehicle Fuel | | 64,294 | 8,500 | 64,294 | 8,500 | 64,294 | 8,500 | 64,294 | 8,500 | 64,294 | 8,500 | 64,294 | 8,500 | 64,294 |
| Truck R&M | | - | 6,796 | - | 858 | - | 6,796 | - | 858 | - | 858 | - | 858 | - |
| Other Vehicle Costs | | - | 14,520 | 3,578 | 9,771 | - | 14,520 | 3,578 | 9,771 | - | 9,771 | - | 9,771 | - |
| **Transportation Expenses** | | **64,294** | **29,816** | **67,872** | **19,129** | **64,294** | **29,816** | **67,872** | **19,129** | **64,294** | **19,129** | **64,294** | **19,129** | **64,294** |
| **Facility Expenses** | | | | | | | | | | | | | | |
| Facility & Parking Rent | | - | - | - | 54,273 | - | - | - | - | 54,273 | - | - | - | 54,273 |
| Utilities/Garbage/Jan Supplies | | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 | 5,760 |
| **Facility Expenses** | | **5,760** | **5,760** | **5,760** | **60,033** | **5,760** | **5,760** | **5,760** | **5,760** | **60,033** | **5,760** | **5,760** | **5,760** | **60,033** |
| **Licenses & Fees** | | | | | | | | | | | | | | |
| Water Discharge Fee | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| EPA ID | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| CA Haz Waste | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| County/City - Permit | | - | 15,772 | - | - | - | 15,772 | - | - | - | 15,772 | - | - | - |

4/9/2013

Evergreen OVERALL Cash Flow DOCUMENTversion 1 3-2013 v7 xls - Detailed Consolidation

Page 2 of 3

| | NOTES | WE Apr12 Forecast Total | WE Apr19 Forecast Total | WE Apr26 Forecast Total | WE May3 Forecast Total | WE May10 Forecast Total | WE May17 Forecast Total | WE May24 Forecast Total | WE May31 Forecast Total | WE Jun7 Forecast Total | WE Jun14 Forecast Total | WE Jun21 Forecast Total | WE Jun28 Forecast Total | WE Jul5 Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Heavy Vehicle | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Licenses & Fees** | | - | 15,772 | - | - | - | 15,772 | - | - | - | 15,772 | - | - | - |
| **Property Taxes, Sales Tax** | | - | - | 4,002 | - | - | - | - | 4,002 | - | - | - | 4,002 | - |
| Insurance | | | | | | | | | | | | | | |
| Vehicle | | 13,981 | - | - | 13,981 | - | - | - | - | - | 13,981 | - | - | - |
| Property | | 91,509 | - | - | 91,509 | - | - | - | - | - | 91,509 | - | - | - |
| G&A | | 21,606 | - | - | 21,606 | - | - | - | - | - | 21,606 | - | - | - |
| **Insurance** | | 127,096 | - | - | 127,096 | - | - | - | - | - | 127,096 | - | - | - |
| G&A Expenses | | | | | | | | | | | | | | |
| Payroll Processing Fees | | 956 | 956 | 956 | 956 | 956 | 956 | 956 | 956 | 956 | 956 | 956 | 956 | 956 |
| Tax, Audit and Legal Fees | k | 216,000 | 45,000 | 85,000 | 45,000 | 77,500 | 37,500 | 77,500 | 37,500 | 37,500 | 37,500 | 77,500 | 37,500 | 37,500 |
| Office Supplies, Postage, etc. | | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 | 2,624 |
| Telephone | | - | 6,332 | 6,332 | 6,332 | 6,332 | 6,332 | 6,332 | 6,332 | 6,332 | 6,332 | 6,332 | 6,332 | 6,332 |
| Equipment Rental & Maint | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Consultants, Contractors & Temps | j | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 | 5,284 |
| Dues, Pubs, Adv, PR, R&D, Trade Shows, Contributions | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Travel & Ent | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Auto Expenses | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Emp Relations, Recruiting, Med Exams | | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 | 1,226 |
| Penalties, Misc. | | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| **Total G&A Expenses** | | 226,140 | 61,472 | 101,472 | 61,472 | 93,972 | 53,972 | 93,972 | 53,972 | 53,972 | 53,972 | 93,972 | 53,972 | 53,972 |
| Payroll and Related | | | | | | | | | | | | | | |
| Payroll | | 510,735 | 46,555 | 591,149 | 48,432 | 510,735 | 46,555 | 591,149 | 48,432 | 510,735 | 48,432 | 591,149 | 48,432 | 510,735 |
| Health Insurance | | - | - | - | 211,233 | - | - | - | 211,233 | - | - | - | 211,233 | - |
| Workers Comp | a | - | - | - | 24,083 | 24,083 | 24,083 | - | - | - | 45,097 | - | - | - |
| **Payroll & Related** | | 510,735 | 46,555 | 591,149 | 283,748 | 534,818 | 70,638 | 591,149 | 259,665 | 510,735 | 93,529 | 591,149 | 259,665 | 510,735 |
| Bank Interest and Charges | | | | | | | | | | | | | | |
| Interest Payments | b | 1,253 | 1,253 | 156,667 | 1,253 | 1,253 | 1,253 | 1,253 | 173,334 | 1,253 | 1,253 | 1,253 | 1,253 | 190,001 |
| Bank Charges | g | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 | 8,462 |
| **Total Bank Interest and Charges** | | 9,715 | 9,715 | 165,129 | 9,715 | 9,715 | 9,715 | 9,715 | 181,796 | 9,715 | 9,715 | 9,715 | 9,715 | 198,463 |
| | | 1,466,612 | 1,527,658 | 2,214,724 | 1,906,711 | 2,034,477 | 1,254,241 | 1,914,272 | 1,641,474 | 1,927,571 | 1,422,123 | 1,944,972 | 1,469,393 | 1,957,579 |
| | | (288,032) | (898,965) | (1,558,424) | (995,871) | (511,622) | 267,566 | (392,211) | (118,759) | (404,687) | 100,342 | (422,586) | 53,109 | (434,989) |
| **Utility Deposits** | e | 252,212 | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Non Recurring Capital Expenses | h | - | - | - | 75,000 | - | - | - | - | - | - | - | - | - |
| Other (Capital Lease) | | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 |
| | | 253,338 | 1,126 | 1,126 | 76,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 | 1,126 |
| **DIP REQUIRED** | | (541,370) | (900,091) | (1,559,550) | (1,071,997) | (512,748) | 266,440 | (393,337) | (119,885) | (405,813) | 99,216 | (423,712) | 51,983 | (436,115) |
| | | | | | | | | | | | | | | (5,946,979) |

NOTES:
a. Worker's compensation premiums estimated at 10% increase over PY & deposit.

| | NOTES | WE Apr12 Forecast Total | WE Apr19 Forecast Total | WE Apr26 Forecast Total | WE May3 Forecast Total | WE May10 Forecast Total | WE May17 Forecast Total | WE May24 Forecast Total | WE May31 Forecast Total | WE Jun7 Forecast Total | WE Jun14 Forecast Total | WE Jun21 Forecast Total | WE Jun28 Forecast Total | WE Jul5 Forecast Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

b. Includes monthly interest to Guggenheim.

c. Feed stock purchase @ 1.90/gal

d. Assumes running on current volume with no additional feedstock

g. bank charges include merchant service fee for accepting credit card payments

h. 75k Ingersoll Rand Compressor for Operations.

i. Includes $100k & $300k for T1 & T2 projects to resolve all refinery issues.

j. Includes Health & Safety Contractor & Sacramento Lobbyist.

k. Includes Chapter 11 retainers  & expenses for Neale, Stern & Broadway Advisors

1
2
3
4
5
6
7
8
# **<u>EXHIBIT "2"</u>**
9
10
[List of Evergreen Oil, Inc. Employees]
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Evergreen Oil, Inc.
Payroll register
Period ending 03/24/2013
Pay date 03/29/2013

| Employee name | Dept # | Gross Wages | FIT | SS | MED | State | SDI | 401K | Caf 125 | Loans | Misc. | Net |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Farran, Albert J. | 065 | 3,725.48 | 618.80 | 216.57 | 50.65 | 231.31 | 34.86 | - | 239.38 | 94.15 | - | 2,239.76 |
| Hufana Jr. Benjamin | 065 | 1,812.80 | 169.87 | 110.94 | 25.94 | 31.21 | 17.89 | 108.77 | 23.57 | 94.00 | 6.90 | 1,223.71 |
| Lester Rebeca | 065 | 1,751.00 | 157.65 | 104.76 | 24.50 | 31.04 | 16.88 | 437.75 | 63.18 | - | 5.60 | 909.64 |
| Madlangbayan Vera D. | 065 | 1,905.50 | 144.18 | 105.71 | 24.72 | 23.68 | 17.00 | 190.55 | 205.74 | - | - | 1,193.92 |
| Martin, Jeffrey D. | 065 | 1,771.60 | 130.18 | 97.20 | 22.73 | 21.77 | 15.66 | - | 205.74 | 121.86 | - | 1,156.46 |
| Nguyen, Thu-Tuyet | 065 | 3,345.44 | 533.57 | 197.60 | 46.21 | 174.54 | 31.80 | 334.54 | 135.69 | 239.04 | 48.12 | 1,604.33 |
| Pascua Edilberto | 065 | 2,260.00 | 400.46 | 135.20 | 31.62 | 124.61 | 21.81 | 67.80 | 79.45 | - | 16.80 | 1,382.25 |
| Tran, Adrian | 065 | 1,920.80 | 121.41 | 106.33 | 24.87 | 14.90 | 17.15 | 57.62 | 205.74 | - | - | 1,372.78 |
| Watson, Robert A. | 065 | 2,591.09 | 366.59 | 157.59 | 36.86 | 128.10 | 25.27 | 50.00 | 63.81 | 128.28 | 100.00 | 1,534.59 |
| Atole, Andy F. | 066 | 1,868.28 | - | 105.62 | 24.70 | - | 17.04 | 56.05 | 164.60 | 41.87 | - | 1,458.40 |
| Green, Gary R. | 066 | 2,683.95 | 357.74 | 154.03 | 36.02 | 96.45 | 24.85 | 402.59 | 199.50 | - | - | 1,412.77 |
| Alcala, Ismael | 067 | 3,307.70 | 328.03 | 203.91 | 47.68 | 94.07 | 32.84 | 99.23 | 23.57 | - | - | 2,478.37 |
| Crckett, Monteico | 067 | 3,163.30 | 284.98 | 189.16 | 44.24 | 160.38 | 30.51 | - | 112.48 | 37.83 | 67.20 | 2,236.52 |
| French, Donald | 067 | 3,001.86 | 497.90 | 182.44 | 42.66 | 170.89 | 29.43 | 90.06 | 59.30 | - | 31.99 | 1,897.19 |
| Lopez Jr. Ronald | 067 | 4,264.49 | 354.97 | 264.40 | 61.84 | 280.14 | 42.65 | - | - | - | - | 3,260.49 |
| Polk, Donald W. | 067 | 4,978.60 | 1,015.70 | 305.87 | 71.54 | 388.17 | 49.33 | - | 45.20 | - | 787.00 | 2,315.79 |
| Stonich, Timothy | 067 | 4,230.77 | 294.97 | 247.72 | 57.93 | 125.51 | 39.91 | 126.92 | 239.38 | 34.09 | - | 3,064.34 |
| Ware, James W. | 067 | 2,692.90 | 78.39 | 155.09 | 36.27 | 17.68 | 25.02 | 80.79 | 191.51 | - | 150.00 | 1,958.15 |
| Weaver, Richard F. | 067 | 2,419.65 | 114.16 | 122.87 | 28.74 | 17.17 | 19.81 | 72.59 | 437.94 | - | - | 1,606.37 |
| Alcantara, Carlos C. | 068 | 1,745.64 | 116.07 | 85.20 | 19.93 | 19.51 | 13.74 | 52.37 | 371.46 | 80.39 | - | 986.97 |
| Alcantara Jose | 068 | 2,369.64 | 362.36 | 143.24 | 33.50 | 115.43 | 23.11 | - | 59.30 | - | 0.49 | 1,632.21 |
| Barker, Gerald | 068 | 2,406.02 | 46.66 | 141.38 | 33.06 | 5.15 | 22.80 | 144.36 | 125.80 | - | - | 1,886.81 |
| Barton II, Donald | 068 | 1,899.90 | 217.88 | 114.48 | 26.77 | 60.56 | 18.47 | 113.99 | 53.46 | - | - | 1,294.29 |
| Bible, Clifford D. | 068 | 1,391.25 | 162.72 | 86.26 | 20.18 | 12.48 | 13.91 | 41.74 | - | - | - | 1,053.96 |
| Grace, Jason C. | 068 | 2,475.04 | 367.86 | 150.65 | 35.23 | 106.73 | 24.29 | 247.50 | 45.20 | - | - | 1,497.58 |
| Brown, Markus | 068 | 4,968.74 | 666.53 | 302.32 | 70.71 | 327.45 | 48.76 | 149.06 | 92.65 | 141.71 | - | 3,169.55 |
| Carney, John P. | 068 | 2,451.04 | 352.01 | 145.24 | 33.96 | 111.19 | 23.43 | 73.53 | 108.56 | - | 1.73 | 1,601.39 |
| Carney, Michael J. | 068 | 3,218.91 | 355.29 | 186.81 | 43.69 | 99.31 | 30.13 | 96.57 | 205.74 | 93.25 | - | 2,108.12 |
| Chase Jr. John | 068 | 3,577.40 | 406.56 | 211.59 | 49.49 | 119.47 | 34.13 | 214.64 | 164.60 | 73.28 | 9.80 | 2,293.84 |
| Chavarria, John | 068 | 3,439.70 | 637.45 | 202.16 | 47.28 | 217.05 | 32.61 | - | 178.99 | - | 62.50 | 2,061.66 |
| Damberg Jeffrey | 068 | 2,353.32 | 364.00 | 143.11 | 33.47 | 105.15 | 23.08 | 141.20 | 45.20 | - | - | 1,498.11 |
| Delgadillo Martha | 068 | 1,384.71 | 160.49 | 81.25 | 19.00 | 32.29 | 13.11 | 41.54 | 74.13 | 13.34 | - | 949.56 |
| Diop, Abdou | 068 | 3,573.98 | 664.73 | 215.58 | 50.42 | 228.21 | 34.77 | 107.22 | 96.91 | - | - | 2,176.14 |
| Emmerson, Antonio D. | 068 | 2,159.76 | 222.13 | 133.82 | 31.30 | 46.54 | 21.59 | 129.59 | 1.31 | 225.07 | 379.54 | 968.83 |
| Estrella, Daniel | 068 | 3,628.71 | 653.69 | 212.94 | 49.80 | 130.69 | 34.35 | 108.86 | 194.16 | - | - | 2,244.22 |
| Foster, Tony | 068 | 4,617.03 | 868.55 | 263.27 | 61.57 | 353.71 | 42.47 | 138.51 | 370.66 | 36.79 | - | 2,481.50 |
| GuerrerGreen Deandreo, Re | 068 | 8,000.00 | 2,000.00 | 496.00 | 116.00 | 528.00 | 80.00 | - | - | - | - | 4,780.00 |
| Guerrero, Rene | 068 | 2,489.02 | 120.78 | 145.93 | 34.13 | 73.78 | 23.54 | 149.34 | 96.91 | 52.30 | 43.36 | 1,748.95 |
| Hunsperger, Randy | 068 | 3,973.85 | 244.75 | 234.05 | 54.74 | 96.05 | 37.68 | 238.43 | 205.74 | - | 14.56 | 2,847.85 |
| Josue,Rey R. | 068 | 3,073.12 | 324.07 | 180.33 | 42.17 | 85.58 | 29.08 | 200.00 | 164.60 | - | - | 2,047.29 |
| Juarez, Mario | 068 | 2,970.22 | 112.04 | 175.04 | 40.93 | 32.04 | 28.23 | 178.21 | 147.05 | - | - | 2,256.68 |
| Knox, Rodney | 068 | 2,292.84 | 47.66 | 133.04 | 31.12 | 5.59 | 21.46 | - | 147.05 | - | 16.80 | 1,890.12 |
| Livingston, Johnny | 068 | 3,185.00 | 181.41 | 190.77 | 44.61 | 126.07 | 30.77 | 318.50 | 108.05 | 181.28 | 9.80 | 1,993.74 |
| Luperine, Chantel | 068 | 1,203.02 | 145.18 | 74.58 | 17.44 | 26.73 | 12.03 | 36.09 | - | - | 0.98 | 889.99 |
| Maddox, Bret | 068 | 1,745.64 | 244.13 | 107.87 | 25.23 | 61.00 | 17.40 | 52.37 | 5.84 | - | - | 1,231.80 |
| Mitchell, Harold | 068 | 2,311.52 | 231.94 | 136.66 | 31.96 | 97.15 | 22.04 | 115.58 | 107.25 | 29.75 | - | 1,539.19 |
| Perkins Duane | 068 | 6,923.08 | 1,131.75 | 422.73 | 98.87 | 411.16 | 67.98 | 415.38 | 124.72 | - | - | 4,250.49 |
| Prasher, Rajv | 068 | 2,311.52 | 401.36 | 135.51 | 31.69 | 99.98 | 21.86 | 69.35 | 125.80 | - | - | 1,425.97 |
| Regalado, Sheena | 068 | 1,823.05 | 189.30 | 103.28 | 24.15 | 50.47 | 16.66 | 54.69 | 157.26 | - | 192.29 | 1,034.95 |

Evergreen Oil, Inc.
Payroll register
Period ending 03/24/2013
Pay date 03/29/2013

| Employee name | Dept # | Gross Wages | FIT | SS | MED | State | SDI | 401K | Caf 125 | Loans | Misc. | Net |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rhines, Philip | 068 | 3,564.37 | 606.74 | 210.48 | 49.23 | 219.83 | 33.95 | 106.93 | 92.65 | - | 76.92 | 2,167.64 |
| Robinson, Robby | 068 | 3,386.92 | 202.92 | 199.79 | 46.72 | 50.02 | 32.22 | 304.82 | 164.60 | 47.00 | 145.70 | 2,193.13 |
| Rodriguez Mario | 068 | 3,792.72 | 225.38 | 224.95 | 52.61 | 84.68 | 36.28 | 227.56 | 164.60 | - | 24.68 | 2,751.98 |
| Sanchez, Percy | 068 | 1,842.40 | 204.98 | 111.06 | 25.97 | 56.02 | 17.92 | 110.54 | 51.04 | - | - | 1,264.87 |
| Sigala, Andrew L. | 068 | 2,809.04 | 156.89 | 165.07 | 38.60 | 35.27 | 26.63 | 168.54 | 146.54 | - | - | 2,071.50 |
| Singh, Param J. | 068 | 2,271.48 | 155.10 | 117.80 | 27.55 | 26.88 | 19.01 | 318.01 | 371.46 | - | 80.21 | 1,155.46 |
| Slater, Thomas | 068 | 4,807.70 | 372.92 | 290.93 | 68.04 | 175.88 | 46.72 | 288.46 | 135.07 | 277.25 | 1,463.08 | 1,689.35 |
| Spear, Stephen J. | 068 | 3,367.31 | 319.25 | 197.35 | 46.15 | 179.16 | 31.79 | 202.04 | 188.94 | - | - | 2,202.63 |
| Tamayo, Miguel | 068 | 4,515.52 | 474.28 | 242.08 | 56.61 | 147.91 | 39.04 | 135.47 | 437.94 | - | 173.00 | 2,809.12 |
| Walker, Norman D. | 068 | 4,230.77 | 804.85 | 258.03 | 60.35 | 291.38 | 41.57 | 126.92 | 73.50 | - | - | 2,574.17 |
| Young, Douglas O. | 068 | 3,653.85 | 252.25 | 223.83 | 52.34 | 100.45 | 35.80 | - | 74.13 | - | - | 2,915.05 |
| Zunino, James L. | 068 | 3,213.12 | 228.84 | 189.01 | 44.20 | 61.43 | 30.48 | 224.92 | 164.60 | - | - | 2,269.64 |
| Panwar, Samta | 070 | 3,846.16 | 374.05 | 238.68 | 55.82 | 98.92 | 38.46 | 653.85 | 0.63 | - | - | 2,385.75 |
| Glover, Denise L. | 073 | 3,076.93 | 216.24 | 181.64 | 42.48 | 143.20 | 29.26 | - | 74.13 | - | 76.92 | 2,313.06 |
| Hart, david | 073 | 1,316.00 | 129.54 | 77.63 | 18.16 | 24.35 | 12.52 | 39.48 | 63.81 | - | 9.80 | 940.71 |
| Ridao, Nancy P. | 073 | 1,663.20 | 212.70 | 99.50 | 23.27 | 58.97 | 16.05 | 83.16 | 58.33 | - | - | 1,111.22 |
| Collett, Stacey | 074 | 2,351.22 | 357.99 | 142.16 | 33.25 | 113.64 | 22.93 | - | 58.33 | 39.39 | - | 1,583.53 |
| Guerrero, Alid | 074 | 2,456.16 | 65.75 | 139.70 | 32.67 | 11.35 | 22.50 | 73.68 | 205.74 | 27.34 | 6.89 | 1,870.54 |
| Breedlove, Gilbert | 076 | 1,065.00 | 77.55 | 66.03 | 15.44 | 13.86 | 10.65 | - | - | - | - | 881.47 |
| Green Tara | 076 | 1,060.00 | 76.80 | 65.72 | 15.37 | 13.75 | 10.60 | - | - | - | - | 877.76 |
| Huber, Carrie | 076 | 1,269.53 | 55.39 | 75.10 | 17.57 | 18.20 | 12.11 | 38.09 | 58.33 | - | - | 994.74 |
| Jameson Phillip | 076 | 2,726.00 | 196.00 | 157.26 | 36.77 | 41.48 | 25.36 | 81.78 | 189.56 | - | 15.10 | 1,982.69 |
| Lopez, Catherine | 076 | 1,435.53 | 123.62 | 84.71 | 19.81 | 27.07 | 13.67 | 43.07 | 57.70 | - | 14.47 | 1,051.41 |
| Malone, Mary | 076 | 2,006.10 | 160.73 | 119.71 | 28.00 | 59.52 | 19.30 | 60.18 | 63.81 | - | 17.70 | 1,477.15 |
| Cameron, Brad | 082 | 2,552.04 | 300.60 | 158.23 | 37.00 | 75.25 | 25.52 | - | - | 256.67 | - | 1,698.77 |
| Hedrick, Thomas | 082 | 2,917.00 | 290.24 | 172.54 | 40.35 | 71.94 | 27.83 | - | 134.06 | 198.41 | 13.72 | 1,967.91 |
| Lemieux, Richard | 082 | 2,022.86 | 17.61 | 115.66 | 27.05 | - | 18.66 | 20.23 | 157.26 | 342.23 | - | 1,324.16 |
| Marshall, Daniel | 082 | 2,000.00 | 136.62 | 116.49 | 27.24 | 19.36 | 18.78 | 120.00 | 121.15 | - | - | 1,440.36 |
| Sanchez, Oscar | 082 | 2,996.27 | 258.06 | 168.55 | 39.41 | 63.29 | 27.19 | - | 239.38 | - | 77.66 | 2,122.73 |
| St. Denis, Joseph N. | 082 | 3,076.93 | 534.51 | 186.17 | 43.54 | 174.93 | 30.03 | 153.85 | 74.13 | - | - | 1,879.77 |
| Campbell, Perry | 084 | 3,258.50 | 570.75 | 191.83 | 44.87 | 189.75 | 30.94 | 100.00 | 164.60 | 198.86 | - | 1,766.90 |
| Blakeley, Edward | 200 | 2,299.50 | 105.47 | 129.82 | 30.36 | 13.16 | 20.94 | 275.94 | 205.74 | 213.90 | - | 1,304.17 |
| Cantrell, David | 200 | 2,781.24 | 276.38 | 162.69 | 38.05 | 70.09 | 26.24 | 83.44 | 157.26 | 102.58 | 39.26 | 1,825.25 |
| Chairez, Guadalupe | 200 | 2,211.13 | 269.50 | 133.62 | 31.25 | 88.38 | 21.55 | 66.33 | 55.88 | - | - | 1,544.62 |
| Christy, Xavier | 200 | 2,562.63 | 368.64 | 149.57 | 34.98 | 118.00 | 24.13 | 76.88 | 150.26 | - | 50.00 | 1,590.17 |
| Cliffton, Lenny | 200 | 2,173.88 | 310.12 | 125.03 | 29.24 | 84.23 | 20.17 | 65.22 | 157.26 | - | - | 1,382.61 |
| Courtney, John | 200 | 1,694.00 | 160.74 | 103.57 | 24.22 | 28.54 | 16.71 | 50.82 | 23.57 | 34.81 | 5.17 | 1,245.85 |
| Dinwiddier, John | 200 | 2,764.94 | 278.89 | 163.70 | 38.28 | 71.20 | 26.40 | 82.95 | 124.72 | - | - | 1,978.80 |
| Escobar, Cheri A. | 200 | 1,858.50 | 267.06 | 113.76 | 26.60 | 69.07 | 18.35 | 55.76 | 23.57 | 256.41 | - | 1,027.92 |
| Hernandez, Steven M. | 200 | 2,098.05 | 349.57 | 125.49 | 29.35 | 137.92 | 20.24 | 314.71 | 74.13 | - | - | 1,046.64 |
| Holmes, Marshall | 200 | 2,721.78 | 232.98 | 159.00 | 37.19 | 47.63 | 25.65 | 163.31 | 157.26 | 44.63 | 4.46 | 1,849.67 |
| Leister, Sans | 200 | 1,527.04 | 115.65 | 82.73 | 19.35 | 19.45 | 13.34 | 15.27 | 135.07 | - | 57.69 | 1,068.49 |
| Lima Jr., Joseph R. | 200 | 3,298.17 | 470.91 | 191.73 | 44.84 | 170.79 | 30.93 | 197.89 | 205.74 | 506.36 | 3.02 | 1,475.96 |
| Ludlow, Christopher M. | 200 | 1,455.39 | 45.29 | 78.48 | 18.35 | 0.87 | 12.65 | 43.66 | 189.56 | - | - | 1,066.53 |
| Misquez, Alfredo | 200 | 2,302.02 | 323.93 | 132.98 | 31.10 | 89.09 | 21.45 | 138.12 | 157.26 | - | - | 1,408.09 |
| Onsurez, Miguel | 200 | 1,858.50 | 54.39 | 103.48 | 24.20 | 0.67 | 16.69 | 55.76 | 189.56 | - | 6.72 | 1,407.03 |
| Rathert, John E. | 200 | 3,596.16 | 545.91 | 213.20 | 49.86 | 179.59 | 34.34 | 539.42 | 123.71 | - | 72.06 | 1,838.07 |
| Rodriguez, Ted | 200 | 2,104.29 | 190.49 | 116.63 | 27.28 | 62.26 | 18.81 | 63.13 | 223.20 | 54.36 | - | 1,348.13 |
| Sanchez, Sammy R. | 200 | 1,753.06 | 144.30 | 93.85 | 21.94 | 36.17 | 15.13 | 52.59 | 239.38 | - | - | 1,149.70 |
| Scaccianoce, Russell | 200 | 1,789.13 | 155.62 | 110.92 | 25.95 | 29.23 | 17.89 | 53.67 | - | - | - | 1,395.85 |

Evergreen Oil, Inc.
Payroll register
Period ending 03/24/2013
Pay date 03/29/2013

| Employee name | Dept # | Gross Wages | FIT | SS | MED | State | SDI | 401K | Caf 125 | Loans | Misc. | Net |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Smith, Michael | 200 | 2,995.13 | 289.53 | 175.95 | 41.15 | 75.88 | 28.38 | 209.66 | 157.26 | 201.37 | - | 1,815.95 |
| Sokil Peter | 200 | 1,097.25 | 62.80 | 68.03 | 15.91 | 10.17 | 10.97 | - | - | - | - | 929.37 |
| Verdina, Robert | 200 | 1,859.63 | 257.28 | 111.34 | 26.04 | 27.34 | 17.96 | 55.79 | 63.81 | - | - | 1,300.07 |
| Collins, Philip | 250 | 1,722.16 | 200.83 | 97.09 | 22.70 | 48.47 | 15.66 | 51.66 | 156.25 | - | - | 1,129.50 |
| Farfan, Mario | 250 | 1,594.44 | 38.80 | 84.02 | 19.65 | - | 13.55 | 47.83 | 239.38 | 75.19 | - | 1,076.02 |
| Fernandez, Jose | 250 | 1,751.00 | 172.57 | 108.56 | 25.39 | 21.11 | 17.51 | 52.53 | - | - | - | 1,353.33 |
| Guevara Adolfo | 250 | 1,851.75 | 105.56 | 114.81 | 26.85 | 14.65 | 18.52 | - | - | - | - | 1,571.36 |
| Leomiti Jr., Firipele | 250 | 1,723.50 | 130.23 | 97.11 | 22.71 | 21.79 | 15.66 | - | 157.26 | 13.34 | - | 1,265.40 |
| Leyva, Alfredo L. | 250 | 1,854.00 | 114.12 | 103.19 | 24.13 | 13.78 | 16.65 | 55.62 | 189.56 | - | - | 1,336.95 |
| Magallanes, Ruben | 250 | 1,724.22 | 140.10 | 92.06 | 21.53 | 34.32 | 14.84 | 51.73 | 239.38 | 81.60 | - | 1,048.66 |
| Martin Samuel | 250 | 1,831.50 | 15.50 | 103.80 | 24.28 | - | 16.74 | - | 157.26 | - | 31.19 | 1,482.73 |
| Miramontes, Alex | 250 | 1,836.00 | 233.73 | 105.46 | 24.66 | 57.34 | 17.01 | 55.08 | 135.07 | - | - | 1,207.65 |
| Quiroz Antonio | 250 | 1,760.00 | 136.80 | 109.12 | 25.52 | 19.41 | 17.60 | - | - | - | - | 1,451.55 |
| Silva Marco | 250 | 1,415.25 | 114.93 | 87.74 | 20.52 | 28.74 | 14.15 | - | - | - | - | 1,149.17 |
| Warren Sr., Jason | 250 | 1,642.88 | 128.35 | 90.10 | 21.07 | 29.15 | 14.53 | 98.57 | 189.56 | - | - | 1,071.55 |
| Henley, Charles | 350 | 2,509.20 | 248.09 | 145.82 | 34.10 | 57.65 | 23.52 | - | 157.26 | 58.55 | 21.56 | 1,762.65 |
| Monroe, Sharlow | 450 | 2,672.25 | 120.67 | 153.93 | 36.00 | 46.69 | 24.82 | 80.17 | 189.56 | - | - | 2,020.41 |
| Murillo, Flavio | 450 | 1,738.41 | 191.10 | 103.87 | 24.29 | 51.26 | 16.76 | 52.15 | 63.18 | - | - | 1,235.80 |
| Talbert James | 450 | 1,428.38 | 184.40 | 88.56 | 20.71 | 42.81 | 14.28 | - | - | - | - | 1,077.62 |
| Avra, Randall | 500 | 3,269.23 | 559.40 | 194.83 | 45.57 | 185.11 | 31.12 | 163.46 | 157.26 | 136.84 | - | 1,795.64 |
| Cabada Luis | 500 | 640.00 | 10.54 | 39.68 | 9.28 | - | 6.40 | - | - | - | - | 574.10 |
| Daly Marc | 500 | 2,204.00 | 335.77 | 136.65 | 31.96 | 104.55 | 22.04 | - | - | - | - | 1,573.03 |
| Flores Jr., Daniel | 500 | 2,106.50 | 352.61 | 129.25 | 30.23 | 90.39 | 20.85 | 63.20 | 21.94 | 53.04 | 6.89 | 1,338.10 |
| Garcia, Ramon | 500 | 2,034.77 | 340.95 | 122.54 | 28.66 | 77.48 | 19.76 | 101.74 | 58.33 | 342.19 | - | 943.12 |
| Heffner, Robert E. | 500 | 3,801.64 | 543.56 | 220.93 | 51.67 | 211.47 | 35.63 | 228.10 | 238.38 | 41.05 | - | 2,230.85 |
| Higgins, Keith E. | 500 | 1,861.50 | 49.10 | 103.66 | 24.24 | - | 16.72 | 111.69 | 189.56 | 162.25 | - | 1,204.28 |
| Jimenez, Cipriano | 500 | 2,195.00 | 111.26 | 121.24 | 28.35 | 16.32 | 19.56 | 65.85 | 239.38 | - | - | 1,593.04 |
| Jones, Courtney L. | 500 | 1,621.88 | 119.41 | 92.62 | 21.66 | 30.71 | 14.94 | 48.66 | 128.07 | - | - | 1,165.81 |
| Mazariegos frankie | 500 | 2,777.50 | 516.65 | 172.21 | 40.28 | 167.62 | 27.78 | - | - | - | - | 1,852.96 |
| Moran, Jose E. | 500 | 2,593.13 | 151.74 | 148.01 | 34.62 | 30.40 | 23.88 | 77.79 | 205.74 | - | 25.05 | 1,895.90 |
| Nash Chris | 500 | 2,377.50 | 274.42 | 147.41 | 34.48 | 63.73 | 23.78 | - | - | - | - | 1,833.68 |
| Rodriguez, Francisco | 500 | 1,959.16 | 278.05 | 111.72 | 26.13 | 85.90 | 18.02 | 58.77 | 157.26 | 24.12 | 4.90 | 1,194.29 |
| Smith, Malcolm Jerome | 500 | 1,927.80 | 176.11 | 106.77 | 24.97 | 28.64 | 17.22 | - | 205.74 | 42.78 | - | 1,325.57 |
| Williams, Kenneth | 500 | 2,807.00 | 443.12 | 159.19 | 37.23 | 137.53 | 25.67 | 84.21 | 239.38 | - | 15.10 | 1,665.57 |
| Cueva, Raul | 550 | 1,900.24 | 145.99 | 116.46 | 27.24 | 22.11 | 18.79 | 57.01 | 21.94 | 59.83 | - | 1,430.87 |
| Mullen, Christopher | 550 | 1,382.25 | 3.28 | 70.89 | 16.58 | - | 11.44 | 41.47 | 238.76 | - | - | 999.83 |
| Wamboldt, Steven | 550 | 2,056.75 | 229.01 | 122.93 | 28.75 | 64.48 | 19.82 | 205.68 | 74.13 | - | - | 1,311.95 |
| Canevaro, Paul | 560 | 2,653.13 | 442.18 | 154.74 | 36.19 | 71.55 | 24.96 | - | 157.26 | - | - | 1,766.25 |
| Dunstan, Richard | 560 | 2,104.25 | 298.24 | 125.87 | 29.44 | 80.05 | 20.30 | 126.26 | 74.13 | - | - | 1,349.96 |
| Okino, Fred | 560 | 2,211.21 | 199.22 | 128.72 | 30.10 | 42.02 | 20.76 | 50.00 | 135.07 | 49.37 | - | 1,555.95 |
| Pacheco, Craig | 560 | 2,287.65 | 79.74 | 127.00 | 29.70 | 11.48 | 20.48 | 68.63 | 239.38 | - | 25.48 | 1,685.76 |
| Rosa, Joseph | 560 | 2,029.38 | 105.58 | 113.07 | 26.45 | 12.46 | 18.24 | 121.76 | 205.74 | - | - | 1,426.08 |
| Shelton, Marlon | 560 | 2,317.50 | 344.95 | 133.94 | 31.32 | 97.36 | 21.60 | 69.53 | 157.26 | - | - | 1,461.54 |
| Van Groningen, Joe | 560 | 3,486.16 | 525.03 | 206.43 | 48.28 | 181.99 | 33.10 | 348.62 | 157.26 | 350.74 | 19.23 | 1,615.48 |
| Miramontes, David | 565 | 2,388.76 | 385.59 | 144.14 | 33.71 | 113.99 | 23.25 | 71.66 | 63.81 | - | - | 1,552.61 |
| Nakiso, William M. | 565 | 3,461.54 | 586.22 | 202.15 | 47.28 | 207.03 | 32.56 | 50.00 | 205.74 | 85.49 | 6.90 | 2,038.17 |
| Selvidge Edwin | 565 | 2,460.50 | 169.55 | 142.80 | 33.40 | 85.15 | 23.03 | 73.82 | 157.26 | - | - | 1,775.49 |
| Vargas Hector | 565 | 2,920.00 | 492.87 | 181.04 | 42.34 | 168.83 | 29.20 | 87.60 | - | - | - | 1,918.12 |
| Bandaza, Andrew J. | 570 | 2,692.31 | 161.12 | 152.67 | 35.71 | 33.15 | 24.53 | 80.77 | 239.38 | - | - | 1,964.98 |
| Cunningham, Andrew J. | 570 | 3,334.62 | 312.36 | 194.35 | 45.45 | 81.68 | 31.31 | 200.08 | 204.11 | 148.19 | - | 2,117.09 |

Evergreen Oil, Inc.
Payroll register
Period ending 03/24/2013
Pay date 03/29/2013

| Employee name | Dept # | Gross Wages | FIT | SS | MED | State | SDI | 401K | Caf 125 | Loans | Misc. | Net |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gonzalez, Ernest | 570 | 2,538.47 | 149.81 | 143.08 | 33.46 | 27.63 | 22.99 | 152.31 | 239.38 | - | - | 1,769.81 |
| Olivas, Angel | 570 | 1,211.54 | 40.94 | 66.03 | 15.44 | 1.01 | 10.65 | 36.35 | 146.53 | - | - | 894.59 |
| Selberg, kevin J. | 570 | 3,461.54 | 169.20 | 201.01 | 47.01 | 51.69 | 32.22 | 346.15 | 239.38 | - | - | 2,374.88 |
| Gonzalez, Kathryne Theresa | 580 | 1,820.00 | 126.24 | 105.30 | 24.63 | 14.49 | 16.95 | 54.60 | 124.72 | - | - | 1,353.07 |
| Hernandez, Edgardo | 580 | 734.25 | 70.70 | 41.56 | 9.72 | 8.35 | 6.70 | - | 63.81 | - | - | 533.41 |
| Ibison, Melissa Ann | 580 | 2,832.50 | 151.33 | 164.14 | 38.39 | 131.96 | 26.43 | 84.98 | 189.56 | - | - | 2,045.71 |
| Napolitano Rachal | 580 | 1,462.50 | 182.93 | 90.67 | 21.21 | 42.16 | 14.63 | 43.88 | - | - | - | 1,067.02 |
| Ruiz Esparza, Max | 580 | 1,978.25 | 195.82 | 114.91 | 26.88 | 61.59 | 18.54 | 59.35 | 124.72 | - | 37.91 | 1,338.53 |
| Tagumasi, Richard | 580 | 2,307.70 | 203.81 | 128.42 | 30.03 | 100.30 | 20.68 | 161.54 | 239.38 | 102.67 | - | 1,320.87 |
| Voogd Maarten | 580 | 3,846.16 | 368.81 | 224.85 | 52.58 | 124.83 | 36.06 | - | 239.38 | - | 206.80 | 2,592.85 |
| Ayala, Amenda | 630 | 2,098.41 | 292.22 | 121.75 | 28.47 | 77.93 | 19.64 | 83.94 | 134.69 | 100.65 | - | 1,239.12 |
| Dellrocco, Christopher | 630 | 2,938.47 | 386.00 | 171.05 | 40.01 | 70.08 | 27.55 | - | 183.80 | - | 11.20 | 2,048.78 |
| Mercado, Norma Tapia | 630 | 1,691.63 | 94.20 | 100.92 | 23.61 | 30.62 | 16.26 | 50.75 | 63.81 | 13.59 | - | 1,297.85 |
| Moore, Al Capone | 630 | 1,505.63 | 49.51 | 81.19 | 18.99 | 1.80 | 13.10 | 45.17 | 196.09 | - | - | 1,099.78 |
| Perez, Devin | 630 | 1,274.63 | 121.98 | 74.43 | 17.41 | 22.13 | 12.00 | 38.24 | 74.13 | - | - | 914.31 |
| Carriere, Martine | 640 | 2,280.00 | 109.18 | 118.32 | 27.67 | 13.51 | 19.08 | 182.40 | 239.38 | - | 145.40 | 1,425.06 |
| Eisenstaedt, Benjamin A. | 640 | 2,080.00 | 290.35 | 125.38 | 29.33 | 86.07 | 20.22 | - | 57.70 | 93.08 | - | 1,377.87 |
| Escobar, Elizabeth | 640 | 1,760.00 | 52.68 | 96.46 | 22.56 | 17.85 | 15.56 | 105.60 | 204.11 | 85.55 | - | 1,159.63 |
| Hall, Susan H. | 640 | 4,057.69 | 395.74 | 245.30 | 57.37 | 115.67 | 39.26 | 770.96 | 74.13 | - | 57.69 | 2,301.57 |
| Hayes, Darlene Theresa | 640 | 2,000.00 | 47.52 | 119.41 | 27.93 | 37.10 | 19.26 | 60.00 | 74.13 | 42.84 | - | 1,571.81 |
| Kohaut, Sherry Lynne | 640 | 1,472.00 | 21.15 | 72.85 | 17.04 | - | 11.75 | 44.16 | 239.38 | 33.37 | 57.69 | 974.61 |
| Alderete, Yvonne | 650 | 2,520.00 | 450.21 | 146.55 | 34.27 | 149.51 | 23.64 | 252.00 | 156.25 | - | - | 1,307.57 |
| Falcon Beatriz | 650 | 4,230.77 | 700.05 | 255.24 | 59.69 | 285.93 | 41.06 | - | 124.72 | - | - | 2,764.08 |
| Shiraishi, Yukimitsu | 650 | 2,000.81 | 12.35 | 115.68 | 27.05 | - | 18.66 | 673.00 | 135.07 | - | - | 1,019.00 |
| Eisenstaedt, Bernd A. | 810 | 2,307.70 | 258.16 | 137.32 | 32.11 | 68.79 | 21.94 | - | 74.13 | - | 102.67 | 1,612.58 |
| Gill Randy | 830 | 1,153.85 | 53.46 | 71.57 | 16.73 | 3.77 | 11.53 | - | - | - | - | 996.79 |
| Martin Amanda | 830 | 2,040.00 | 109.50 | 114.73 | 26.83 | 51.37 | 18.51 | 122.40 | 189.56 | 78.73 | - | 1,328.37 |
| | | $ 439,532.23 | $ 23,763.38 | $ 12,904.32 | $ 3,017.93 | $ 7,290.05 | $ 2,079.66 | $ 9,357.63 | $ 11,374.17 | $ 3,397.45 | $ 2,577.73 | $ 144,003.82 |

# EXHIBIT "3"

[Utility List]

Evergreen Oil, Inc.
Utility providers

| Provider | Address | Type of service | Account # | Amount of Cash Deposit to be Paid | Deposit Already Held By Provider |
|---|---|---|---|---|---|
| Alameda County Water District | 43885 South Grimmer Blvd., Fremont, CA 94538 | Water | 40890315 | $60.00 | $0.00 |
| Alameda County Water District | 43885 South Grimmer Blvd., Fremont, CA 94538 | Water | 40890305 | $20.00 | $0.00 |
| Alameda County Water District | 43885 South Grimmer Blvd., Fremont, CA 94538 | Water | 40890452 | $30.00 | $0.00 |
| Alameda County Water District | 43885 South Grimmer Blvd., Fremont, CA 94538 | Water | 41038759 | $10,307.00 | $0.00 |
| City of Manteca | 1001 W. Center ST., Manteca, CA 95537 | Water/Sewer | 85775-6094 | $90.00 | $0.00 |
| Helix Water District | 7811 University Ave., La Mesa, CA 91242 | Water | 150-00341-6 | $50.00 | $0.00 |
| Helix Water District | 7811 University Ave., La Mesa, CA 91242 | Water | 150-00342-6 | $40.00 | $0.00 |
| City of El Cajon | 200 Civic Center Way, El Cajon, CA 92020 | Sewer | APN 487-640-18-00 | $30.00 | $0.00 |
| San Diego Gas & Electricity | PO Box 25111, Santa Ana, CA 92799 | Electric | 7160 865 759 6 | $300.00 | $0.00 |
| The Gas Company | PO Box C, Monterrey Park, CA 91756 | Gas | 126 601 3038 1 | $20.00 | $0.00 |
| Golden State Water Company | PO Box 9016, San Dimas, CA 91773 | Water | 8005910000 | $70.00 | $0.00 |
| Southern California Edison | PO Box 300, Rosemead, CA 91772 | Electric | 2-07-704-5441 | $995.50 | $0.00 |
| Southern California Edison | PO Box 300, Rosemead, CA 91772 | Electric | 2-32-928-2404 | $215.50 | $0.00 |
| Tiger Natural Gas, Inc. | 1422 E. 71st. Suite J, Tulsa, OK 74136 | Gas | CA-02-07-0102 | $97,202.50 | $150,000.00 |
| Pacific Gas and Electric Company | 41800 Boscell Rd., Fremont, CA 94538 | Gas/Electric | 2251672842-9 | $110.00 | $0.00 |
| Pacific Gas and Electric Company | 41800 Boscell Rd., Fremont, CA 94538 | Electric | 7563408144-4 | $91.50 | $0.00 |
| Pacific Gas and Electric Company | 41800 Boscell Rd., Fremont, CA 94538 | Electric | 8345413065-5 | $837.50 | $0.00 |
| Pacific Gas and Electric Company | 41800 Boscell Rd., Fremont, CA 94538 | Gas | 8345413065-5 | | |
| Pacific Gas and Electric Company | 41800 Boscell Rd., Fremont, CA 94538 | Gas | 8876777900-7 | $45,473.50 | $0.00 |
| Pacific Gas and Electric Company | 41801 Boscell Rd., Fremont, CA 94538 | Electric | 4886768096-8 | $71,718.00 | $51,910.00 |
| Francisco de la Mora | 2522 S. Cherry Avenue, Fresno, CA 93706 | Electric | n/a (landlord) | $190.00 | $0.00 |
| Pacific Telemanagement Services | 2001 Crow Canyon Rd. Ste. 200, San Ramon, CA 94583 | Phone | 3105158163 | $80.00 | $0.00 |
| Verizon California | PO Box 920041, Dallas, TX 75392 | Phone | 01 2564 1151187268 09 | $260.00 | $0.00 |
| Verizon Wireless | PO Box 660108, Dallas, TX 75266-0108 | Cell | 970255655-00001 | $5,856.93 | $0.00 |
| Telepacific Communications | 515 Flower St. 47th. Floor, Los Angeles, CA 90071 | Phone | 11994 | $2,403.00 | $0.00 |
| Century Link | PO Box 52167, Phoenix AZ 85072 | Phone | 83968170, 71, 72 & 73 | $20.00 | $0.00 |
| Verizon Communications | PO Box 920041, Dallas, TX 75392 | Phone | 3956256460 | $170.00 | $0.00 |
| AT & T | PO Box 5025, Carol Stream, IL 60197 | Phone | 072 173-4191 380 | $320.00 | $0.00 |
| AT & T | PO Box 5025, Carol Stream, IL 60197 | Phone | 5694864181774 | $80.00 | $0.00 |
| Megapath | 6800 Koll Center Parkway, Pleasanton, CA 94566 | Internet | 2109136 | $3,355.00 | $0.00 |
| AAA Truck Wash, LLC | 15420 W. August Avenue, Delhi, CA 95315 | Truck/Tankers wash | N/A | $150.00 | $0.00 |
| American Lawn Maintenance | P.O. Box 3365, Fremont, CA 94539 | Lawn service | N/A | $220.00 | $0.00 |
| BATA | 475 The Embarcadero, San francisco, CA 94111 | FasTrak-Bridge Tolls | 72150-20-200 | $1,500.00 | $0.00 |
| BATA | 475 The Embarcadero, San francisco, CA 94111 | FasTrak-Bridge Tolls | 72150-20-210 | $1,500.00 | $0.00 |
| Valley Waste Management | 2658 main, St., Walnut Creek, CA 94596 | Pol Rent-Newark | 894-0046938-1044-4 | $197.00 | $0.00 |
| Valley Waste Management | 2658 main, St., Walnut Creek, CA 94596 | Pol Rent-Newark | 894-0052773-1044-6 | $429.00 | $0.00 |
| Vanguard Cleaning Systems. Inc. | 655 Mariner's Island Blvd. # 303, San Mateo, CA 94404 | Cleaning Services | 005570 | $425.00 | $0.00 |
| Vanguard Cleaning Systems. Inc. | 655 Mariner's Island Blvd. # 303, San Mateo, CA 94404 | Cleaning Services | 005525 | $975.00 | $0.00 |
| Waste Management | 8761 Younger Creek, Dr., Sacramento, CA 95828 | Pol Rent | 801-0014091-0050-8 | $150.00 | $0.00 |
| Waste Management | 8761 Younger Creek, Dr., Sacramento, CA 95828 | 1-4 yard fel | 502-0048788-0050-9 | $147.00 | $0.00 |
| Waste management-LA Metro | 13940 E Live Oak Avenue, Baldwin Park, CA 91706 | 1-4 yard fel | 157-0002836-0159.9 | $226.00 | $0.00 |
| Waste management-LA Metro | 1001 W. Bradley Ave., El cajon, CA 92020 | 1-3 yard fel | 130-0005254-1584-0 | $115.00 | $0.00 |
| Waste management-LA Metro | 172 98Th Avenue, Oakland, CA 94603 | 1-6 yard fel | 600-0008417-2216-8 | $1,271.00 | $0.00 |
| Waste management-LA Metro | 172 98Th Avenue, Oakland, CA 94603 | 40 yard rolloff | 600-0031958-2216-0 | $1,111.00 | $0.00 |
| Waste management-LA Metro | 1580 E. Elwood St., Phoenix, AZ 85040 | Solids disposal | 384-0006303-2384-7 | $3,399.67 | $0.00 |

| TOTALS | | | | $252,211.60 |
|--------|--|--|--|-------------|